**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Martin CARDENAS ALVARADO,**
**Defendant-Appellant.**

No. 86–1273
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Dec. 11, 1986.

William R. Maynard, Asst. Fed. Pub. Defender, El Paso, Tex., for defendant-appellant.

Helen M. Eversberg, U.S. Atty., Joe Galenski, El Paso, Tex., Sidney Powell, Asst.

U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, GARWOOD and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Appellant Martin Cardenas Alvarado (Cardenas) was convicted on various drug related charges. On appeal, Cardenas claims that there was insufficient evidence to support his convictions and that the prosecutor violated his Fifth Amendment privilege against self-incrimination by commenting on his silence in violation of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Finding no merit to these contentions, we affirm.

### I.

On Thursday, January 9, 1986, at approximately 8:30 p.m., two United States Border Patrol agents, Ed Barrett and Fred Bauman, were on surveillance on the Mexico border approximately five and one-half miles east of the Ysleta port-of-entry near El Paso, Texas. They parked their marked van on the crossover of an irrigation ditch six to eight hundred yards from the Rio Grande boundary with Mexico. They knew that the particular area was commonly used by undocumented Mexican field workers to cross illegally into the United States to work, usually in groups of two to four people.

The agents noticed unusual movement along a drainage canal, and using binoculars they could see a string of people carrying bundles approaching them. The people were walking single file, evenly spaced, but close together. As the people walked closer to the van, they suddenly disappeared from the agents' view.

The agents immediately turned on the van's headlights and drove along the drainage ditch to cut them off before they could run back across the border. Upon arriving at the south end of the ditch, approximately 300 yards away, Cardenas ran in front of the van. The agents captured him but were unable to catch two other people they saw running back into Mexico. The agents found tracks from Mexico into the United States that looked like other people had crossed the canal. They also noticed tracks corresponding to Cardenas' attempted flight and those of the group that escaped. The agents questioned Cardenas as to his nationality and papers. They asked Cardenas if he or anyone in his group was armed, and he said no. They put Cardenas in the Border Patrol van and continued along the ditch to the area where they had seen the others disappear.

Back at the north end of the ditch, Barrett and Bauman found nine other people lying in the drainage ditch, and interspersed among them were bundles of marijuana—four packages to the bundle—rigged to be carried on a person's back. The agents told them not to move and asked if they or anyone else in the area had weapons. They answered in the negative. The agents then moved each person out of the ditch and searched him. When the situation seemed under control, the agents radioed for assistance and read each person his *Miranda* rights.

Border Patrolmen Lopez and Andrew arrived about twenty minutes later. All who were apprehended were loaded into the two vehicles. The agents began gathering the bundles of marijuana that had been dropped along the drainage ditch. They found 119 packages weighing approximately 25 pounds each for a total of 3200 pounds of marijuana. The marijuana had a value of $1.6 million. The packages were bundled and tied with rope to be carried over the shoulders so that one person could carry four packages containing a total of 100 pounds of marijuana. Each of the rope halters was unique. A white dust or powder from the packages of marijuana covered the clothes of those taken into custody, including Cardenas.

Later that night, after being given additional *Miranda* warnings at the nearby

Ysleta Border Patrol station, Barrett asked Cardenas where he was taking the marijuana, whose it was, and how much he had been paid. After Cardenas responded that he did not know, agent Segarra of the Drug Enforcement Administration (DEA) asked what happened, to which Cardenas responded, "Well, I really don't know." When asked about their possession of the marijuana, the others also said that they knew nothing; they did not know who owned the marijuana or where they were to take it. One indicated that he had been paid eight dollars to bring the load across the border.

Each of the persons apprehended, including Cardenas, lived in the same town in Mexico; several were related. Each admitted entering the United States illegally on many previous occasions, and each had been arrested several times by the Border Patrol and returned to Mexico. A federal grand jury returned a four count indictment charging Cardenas and eight others with (1) one count of having conspired to import in excess of 50 kilograms of marijuana into the United States from Mexico, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 963; (2) one count of having imported over 50 kilograms of marijuana into the United States from Mexico in violation of 21 U.S.C. §§ 952(a) and 960(a)(1); (3) one count of having conspired to possess over 50 kilograms of marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846; and (4) one count of possession of over 50 kilograms of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

Each of the defendants except Cardenas testified at trial. They admitted knowing that their actions were illegal but claimed that they were forced at gunpoint to lead a group of thirty in carrying the marijuana into the United States. They testified that they had heard there was work in the United States for a man known as El Bancero. They had taken a bus together from the El Million area in Mexico where they all lived to a town near the Rio Grande. They walked from there to the crossing point at the river where they were waiting to cross that night to work the next morning. A stranger whom they could not describe approached and offered them work, but he did not say what kind or where. Suddenly, after a white stake-bed truck loaded with marijuana and twenty more people arrived, four men with what appeared to be machine guns jumped out and ordered them to take the bundled marijuana across the river.

After a three and one-half day trial, the jury returned a verdict of guilty as to all four counts against all defendants, including Cardenas. Cardenas was sentenced to a term of five years imprisonment on each of counts one and three, and five years imprisonment followed by a five-year special parole term as to each of counts two and four, all four terms to run concurrently. The eight codefendants received identical sentences. Cardenas then perfected this timely appeal.[1]

## II.

■ Cardenas first attacks the sufficiency of the evidence to support his convictions. In drug conspiracy cases, the government must prove beyond a reasonable doubt that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it. *United States v. Jackson*, 700 F.2d 181 (5th Cir.), *cert. denied sub nom. Hicks v. United States*, 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983). It is unnecessary in drug conspiracy cases to prove an overt act in furtherance of the conspiracy. *United States v. Kupper*, 693 F.2d 1129, 1134 (5th Cir.1982). We will not, however, "lightly infer a defendant's knowledge and acquiescence in a conspiracy." *Jackson*, 700 F.2d at 185. A showing that the defendant merely associated with those participating in a conspiracy is insufficient. *Id.* Similarly, the government cannot prove a conspiracy by presenting evidence that only places the defendant in "a climate of activity that

---

**1.** Cardenas is the only defendant who appeals his conviction.

reeks of something foul." *United States v. Galvan,* 693 F.2d 417, 419 (5th Cir.1982).

The government need not prove the existence of a formal agreement to establish a conspiracy, but it must do more than "pile inference upon inference upon which to base a conspiracy charge." *United States v. Sheikh,* 654 F.2d 1057, 1063 (5th Cir.1981) (citation omitted), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982). Circumstantial evidence, however, can be used to show the existence of a conspiracy. *United States v. Aguirre Aguirre,* 716 F.2d 293 (5th Cir. 1983); *see also United States v. Acosta,* 763 F.2d 671 (5th Cir.), *cert. denied sub nom. Weempe v. United States,* —— U.S. ——, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985).

In order to sustain a conviction for the crime of possession of marijuana with intent to distribute, the government must prove three elements: (1) knowing (2) possession of marijuana (3) with intent to distribute it. *United States v. Vergara,* 687 F.2d 57, 61 (5th Cir.1982) (quoting *United States v. Richards,* 638 F.2d 765, 768 (5th Cir.1981), *cert. denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981)). A conviction on the importation offense requires proof of similar elements, the principal difference being that the government must show that the defendant played a role in bringing the marijuana from a foreign country into the United States. *See United States v. Jonas,* 639 F.2d 200, 205 (5th Cir.1981).

Possession of contraband may be actual or constructive, may be joint among several defendants, and may be proved by circumstantial as well as direct evidence. *United States v. Wilson,* 657 F.2d 755, 760 (5th Cir.1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982); *see also United States v. Stanley,* 765 F.2d 1224, 1240 (5th Cir.1985). Constructive possession is the "knowing exercise of, or the knowing power or right to exercise dominion and control over the proscribed substance." *United States v. Marx,* 635 F.2d 436, 440 (5th Cir.1981). In addition, intent to distribute may be inferred from the possession of a large quantity of an illegal substance. *Vergara,* 687 F.2d at 62.

Before examining the record to determine if there is sufficient evidence to support the convictions, we must be mindful of our role in reviewing the sufficiency of the evidence. "The verdict must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We have stated that

[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

*United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc) (footnote omitted), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Under this standard, our review of the record convinces us that there is sufficient evidence to support Cardenas' convictions.[2]

---

2. In examining the evidence, Cardenas contends that we can consider only the evidence introduced during the government's case-in-chief in evaluating the sufficiency of the evidence against him because he rested at the close of the government's evidence. Cardenas is incorrect because he renewed his motion for judgment of acquittal at the close of all of the evidence. When a defendant chooses to present evidence in his behalf following his motion for acquittal and then renews his motion for judgment of acquittal at the end of all the evidence, we have held that "the 'waiver doctrine' requires the reviewing court to examine all the evidence rather than to restrict its examination to the evidence presented in the Government's case-in-chief." *United States v. White,* 611 F.2d 531, 536 (5th Cir.), *cert. denied,* 446 U.S. 992, 100 S.Ct. 2978, 64 L.Ed.2d 849 (1980). In *White,* the defendant apparently called witnesses and presented evidence, whereas in this case Cardenas did not do so. Cardenas, however, utilized his codefendant's testimony concerning duress in his closing argument, and requested that the jury be instructed on duress. In addition, an examination of the record reveals no other reason for Cardenas to ask for a coercion instruction ex-

According to the testimony of the eight codefendants and the observations of the Border Patrol agents, Cardenas was one of a group of thirty people who traveled from El Million by bus and then walked at nightfall to an area on the Mexican border. The defendants loaded the bundles of marijuana on their backs and carried it into the United States. When Cardenas spotted the Border Patrol van, he started running back toward Mexico when the agents caught him. His tracks corresponded with those of the group and approximately thirty bundles of marijuana were found in the area.

Cardenas places great emphasis on the fact that he was in a group of three or four others separate from the other eight who were arrested with the contraband and that he was spotted and arrested several hundred yards away from the other defendants. Cardenas alleges that the area where he was arrested is known to be an area where illegal aliens who want to work in the United States seek entry. Thus, Cardenas contends that his conviction is improper because there was insufficient evidence to connect him to the other defendants.

We disagree with Cardenas' contentions. The fact that he was found in a different area than the other defendants does not preclude a jury from concluding that he was guilty of both the substantive crimes and the conspiracy when there is sufficient evidence that creates a nexus between Cardenas and the other defendants. We believe that there is sufficient evidence to create this nexus. The Border Patrol agents testified that field workers normally cross the border in the morning and usually cross in small groups. In contrast, the defendants in this case met at 8:30 p.m. Furthermore, the other defendants testified that Cardenas was one of a group of at least ten people who had traveled to the border together. The fact that he was captured as part of a small group does not negate the ability of the jury to conclude that Cardenas was part of a conspiracy to import and distribute the marijuana into the United States. Also, as noted earlier, Cardenas ran back toward Mexico when he was spotted by the Border Patrol agents. The jury was entitled to infer that Cardenas' flight was indicative of guilt. *See United States v. Meneses-Davila*, 580 F.2d 888, 896 & n. 16 (5th Cir.1978) (citing cases). Further, the packages of marijuana were covered in a white powder or dust that was also on the clothes of Cardenas and the other defendants. This evidence would allow the jury to infer that Cardenas had possession of the marijuana. Moreover, the large amount of marijuana discovered—3200 pounds—is sufficient to allow the jury to infer intent to distribute. *See, e.g., Vergara*, 687 F.2d at 62; *Meneses-Davila*, 580 F.2d at 896 (250 pounds of marijuana). The destination of the marijuana was the United States; this factor is sufficient additional proof for the importation offense. *Jonas*, 639 F.2d at 205. In essence, the jury verdict was dependent on the credibility assessments of the jury, and we will not second-guess those judgments. The defense of coercion was adequately presented to the jury which rejected it.

cept that he hoped to benefit from his codefendants' version of what happened. Under these circumstances, we believe that *White* allows us to review all of the evidence in evaluating its sufficiency. We express no opinion, however, on whether or not our view would be the same in a situation where a defendant has other reasons to ask for a coercion instruction apart from hoping to benefit from the testimony of codefendants.

Furthermore, our decisions in *United States v. Belt*, 574 F.2d 1234 (5th Cir.1978), and *United States v. Arias-Diaz*, 497 F.2d 165 (5th Cir.1974), cert. denied, 420 U.S. 1003, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975), are not to the contrary. In *Belt* the codefendant Williams tried to show through testimony that Belt, and not Williams, was the guilty party. Belt rebutted that testimony but did not attempt to rebut the government's case against him. We held that the district court erred in failing to grant a judgment of acquittal for Belt at the close of the government's case. In *Arias-Diaz* we held that the testimony by a codefendant does not result in a waiver. 497 F.2d at 169. As we have already mentioned, however, Cardenas utilized his codefendant's testimony concerning duress and requested a jury instruction on duress. Consequently, we believe that *Belt* and *Arias-Diaz* are inapplicable to the instant case.

After examining the record, we hold that there is sufficient evidence to support Cardenas' convictions.

### III.

### A.

Cardenas also contends that the prosecutor improperly commented on his post-arrest silence in violation of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In *Doyle* the Supreme Court held that impeachment of a defendant with respect to his post-arrest silence, offered on the theory that silence is inconsistent with an exculpatory story told at trial, violates a defendant's due process rights. The Court's conclusion was based on the ambiguity inherent in a defendant's silence after he has been arrested and informed of his *Miranda* rights. A defendant's silence may indicate that he is exercising the rights of which he has just been advised; it does not necessarily mean that a defendant does not have an exculpatory story to tell.

 Subsequent Supreme Court cases, however, have narrowed the applicability of *Doyle.* In *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam), the Court held that it does not violate due process for a state to permit cross-examination as to post-arrest silence when a defendant chooses to take the stand. *Id.* at 607, 102 S.Ct. at 1312. In *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Court held that impeachment of a testifying defendant by reference to his pre-arrest silence does not violate a defendant's constitutional rights. The Court noted that allowing impeachment through pre-arrest silence does not offend due process because "no governmental action [has] induced [the defendant] to remain silent." *Id.* at 240, 100 S.Ct. at 2130. Consequently, if testimony relates to pre-arrest silence, the constitutional claim has no merit; if it relates to post-arrest silence, there has been a constitutional violation.

 Even if we find that there has been a constitutional violation, however, our in-

quiry does not end. We must then consider whether or not the *Doyle* violation is harmless error under the standards set out in *Chapman v. United States,* 547 F.2d 1240, 1248–49 (5th Cir.), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977). In *Chapman* we described three general types of *Doyle* violations:

> [1] When the prosecution uses defendant's post arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous.
>
> [2] When the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, i.e., when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming.
>
> [3] When there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error.

*Id.* at 1249–50 (citations and footnote omitted). The second and third *Chapman* categories are not rigid rules but instead are guidelines to help a court examine a *Doyle* violation. *Alderman v. Austin,* 695 F.2d 124, 126 n. 7 (5th Cir.1983) (en banc). In addition, we have held in cases following *Chapman* that a prosecutor's remarks must be evaluated in context. *E.g., United States v. Shaw,* 701 F.2d 367, 381 (5th Cir.1983), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). In *Shaw* we stated that:

The alternative tests for determining whether a prosecutor's or witness's remarks constitute comment on a defendant's silence are whether the "manifest intent" was to comment on the defendant's silence or, alternatively, whether the character of the remark was such that the jury would "naturally and necessarily" construe it as a comment on the defendant's silence. Both the intent of the prosecutor and the character of the remarks are determined by reviewing the context in which they occur, and the burden of proving such intent is on the defendant.

*Id.* at 381 (citations and footnote omitted).

 Finally, we note that Cardenas did not object at trial to the testimony that he asserts violates *Doyle.* In such circumstances, our review is even more limited. Consequently, if the prosecutor's statements violate *Doyle* and are not harmless error under *Chapman,* we must then determine whether plain error has occurred. *United States v. Allston,* 613 F.2d 609, 611–12 (5th Cir.1980). *See also Shaw,* 701 F.2d at 382 n. 9. An error that fails to meet the harmless error standard under *Chapman* may nevertheless not be egregious enough to constitute plain error. *See Allston,* 613 F.2d at 611–12. In the context of jury instructions, we have stated that plain error occurs when "the error is so great as to result in the likelihood of a grave miscarriage of justice." *United States v. Franklin,* 586 F.2d 560, 569 (5th Cir.1978) (quoting *United States v. Smith,* 502 F.2d 1250, 1256 (5th Cir.1974)), *cert. denied sub nom., Bonamo v. United States,* 440 U.S. 972, 99 S.Ct. 1536, 59 L.Ed.2d 789 (1979). We believe the same standard is applicable here. With these principles in mind we examine Cardenas' claims.

**B.**

 Cardenas asserts that the testimony elicited by the government on its direct examination of Border Patrol Agents Barrett and Segarra violated *Doyle.*[3]

We disagree that the testimony violates *Doyle. Doyle* is inapplicable to these statements. During these conversations, there is no indication that Cardenas invoked his *Miranda* rights. The burden rested on Cardenas to invoke his right to remain silent. *United States v. Mattoni,* 698 F.2d 691, 695 (5th Cir.1983). Instead of remaining silent, Cardenas responded to the agents' questions. Consequently, *Doyle* does not apply. *See Lofton v. Wainwright,* 620 F.2d 74, 77 (5th Cir.1980) (*Doyle* not applicable when defendant speaks).

\* \* \* \* \* \*

**3.** This testimony was as follows:

[Prosecutor]: Did you have an occasion to have a discussion with one of the defendants? [Barrett]: Yes I did, I spoke with Martin Cardenas.
Q: The first defendant that you had apprehended, is that correct?
A: Yes.
Q: And this was after you had read him his rights, is that correct?
A: Yes.
Q: Alright, could you tell us, please, what did you ask the defendant, Cardenas, and what, if anything, did he tell you?
A: I asked him where he was taking the marijuana, and he said he did not know. I asked him if he knew who the marijuana belonged to. He said he did not know. I asked him "how much were they going to pay you?" He said, "I do not know."
Q: Did the defendant, Cardenas, give you any excuse for his action, or justification for his action on January 6, 1986?
A: No sir.

Q: All right. At any time during your discussions with them, did they tell you that they had been threatened or forced to bring the marijuana into the United States?
[Segarra]: No sir.
Q: Did they relate any explanations as to why they brought the marijuana into the United States?
A: They did not sir.
Q: After you took the initial information concerning these individuals, what else did you do?
A: The individuals were being fingerprinted ... there's a sink in that area. So I brought the individuals in that back area and I had them there by myself. At that time I asked the individuals, "Can you tell me basically what happened this evening?" And the individual says, "Well, I don't know." I said, "Well, do you want to tell me what happened?" "Well, I really don't know." And basically that was their [Cardenas' and another defendant's] answer.

Cardenas also complains that portions of the prosecutor's opening statement and closing argument improperly commented on his silence.[4]

 In deciding whether or not the prosecutor's comments improperly commented on Cardenas' silence, we first note that all but one of the comments in the prosecutor's opening remarks that Cardenas objects to refer to his codefendants and not to him. Cardenas does not have standing to raise possible violations of the constitutional rights of third parties. The general rule is that one may not claim standing in the courts to vindicate the constitutional rights of a third party. *Singleton v. Wulff*, 428 U.S. 106, 113–14, 96 S.Ct. 2868, 2873–74, 49 L.Ed.2d 826 (1976). In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Court held that, due to the personal nature of a person's fourth amendment rights, a person can only complain about violations of his own fourth amendment rights and not the fourth amendment rights of others. *Id.* at 139–40, 99 S.Ct. at 428. The Court has also recognized that the fifth amendment privilege

against self-incrimination is a purely personal right. *Bellis v. United States*, 417 U.S. 85, 89–90, 94 S.Ct. 2179, 2183–84, 40 L.Ed.2d 678 (1974). Thus, the *Bellis* court held that a former partner of a law firm could not invoke the privilege against self-incrimination to refuse to produce records of the law firm as directed by a grand jury subpoena. The Court held that the law partnership had an institutional identity independent of its individual partners and that, since the records were held by the partner in a representative capacity, the partner could not show a violation of *his* fifth amendment rights. Similarly, a defendant's *Miranda* warnings are based on the fifth amendment privilege not to be compelled to incriminate himself. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We believe the teachings of *Bellis* are equally applicable in cases where *Doyle* violations have allegedly occurred: a defendant can only complain about violations of his own rights. Thus, we examine the prosecutor's comments only to the extent that they may have violated Cardenas' rights under *Doyle*.

4. Cardenas complains about the following comments by the prosecutor in his opening statement:

They [Border Patrol agents] apprehended Mr. Cardenas. They questioned Mr. Cardenas. They asked him if he was armed or if anybody was armed and they received a negative res—no, he would not answer. He would not answer, he would not respond to them.

\* \* \* \* \* \*

At that time they apprehended those individuals [referring to the eight codefendants]. Again they questioned those individuals concerning whether those individuals had weapons, whether there was anybody in the area who had weapons. They received a negative response from those individuals.

\* \* \* \* \* \*

Those individuals were subsequently ... interviewed by a number of agents, made no statements or no claims that they had been threatened ... or that anyone had forced them to bring the marijuana into the United States.

\* \* \* \* \* \*

Listen to the number of opportunities that these individuals had to relate that story the night that they were apprehended. And only after they spent an evening together in the El Paso jail did they come up with this story.

Cardenas also complains about the following comments by the prosecutor in his closing argument:

At no time did Mr. Cardenas, according to the evidence in the testimony of these officers, give any type of warning to them. When he was asked if he was armed, at no time did he make any type of outcry concerning weapons. He was placed in the Border Patrol van ... when he was inside the van and they were heading back to another area, at no time, according to the testimony, does Mr. Cardenas give any type of warning to the officers that there are people ... [or] that there was anybody around with guns. And ask yourself as a reasonable person to consider the significance of that in light of the story that the defendants have concocked [sic] which they have presented here to you.

\* \* \* \* \* \*

Now, what would a reasonable person do at that time if you had just been caught, if you are a defendant in the case? A reasonable person would have said, "look, there are people with guns around here. Be careful. Help us. Thank God you came along. We are in fear of our lives." But none of these defendants made any such statement at all of that nature. They gave no warning to the officers at all.

 We agree with Cardenas that the first quoted remark from the prosecutor's opening statement and the quoted remarks from the prosecutor's closing argument violate *Doyle*. All of the prosecutor's comments concern a time period after the Border Patrol agents had apprehended Cardenas and his *Miranda* protection against interrogation had commenced. It seems clear that not only did the prosecutor intend to comment on Cardenas' silence, but the jury would naturally construe it in that way. The prosecutor's comment would naturally be seen by the jury as a comment on Cardenas' failure to offer an exculpatory story immediately as well as a general attack on his credibility. This violates *Doyle*.

 As we have already stated, we must now determine whether the *Doyle* violation is harmless error. *Shaw,* 701 F.2d at 382. We believe that the prosecutor's comments in his opening statement and closing argument constitute harmless error. This case does not seem to fall squarely into any of the categories of cases discussed in *Chapman.* None of the statements which violate *Doyle* came out in the course of the testimony of witnesses but instead occurred only in the opening statement and closing argument. The defense attorney explicitly told the jury in his opening statement that comments by the attorneys were not to be considered evidence by them in deciding the defendants' guilt or innocence. Furthermore, in its charge to the jury, the district court reiterated the fact that statements by attorneys are not evidence in the case. We also find it significant that the comments by the prosecutor did not rebut Cardenas' defense of noninvolvement but instead rebutted his codefendants' coercion story.

The government also presented strong evidence of Cardenas' guilt. For example, Cardenas had white powder from the packages of marijuana on his clothes. In addition, the evidence showed that a close connection existed between Cardenas and the other codefendants. Finally, Cardenas was crossing the border at an unusual time if he was a field worker as he asserted; he also fled when he was spotted by the Border Patrol agents. Under these circumstances, we believe the *Doyle* violations in this case constitute harmless error and *a fortiori* are not plain error.

## IV.

We find sufficient evidence in the record to support Cardenas' convictions. Furthermore, we find the *Doyle* violations by the prosecutor to be harmless error. Accordingly, Cardenas' convictions are AFFIRMED.