**Ronald Dennis FENCL, Petitioner–Appellant,**

v.

**Gordon ABRAHAMSON, Respondent–Appellee.**

**No. 86–1813.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 22, 1986.

Decided March 9, 1988.

Ruth S. Downs, Asst. State Public Defender, Richard J. Phelps, State Public Defender, Madison, Wis., for petitioner-appellant.

Daniel J. O'Brien, Asst. Atty. Gen., Dept. of Justice, Madison, Wis., for respondent-appellee.

Before COFFEY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

On June 9, 1978, a jury in a Wisconsin trial court found the petitioner, Ronald Dennis Fencl, guilty of first degree murder. Mr. Fencl was sentenced to life imprisonment. The judgment and order were appealed to the Wisconsin Court of Appeals. That court certified the questions presented to the Wisconsin Supreme Court, and the Supreme Court affirmed the trial court's judgment. *State v. Fencl*, 109 Wis. 2d 224, 325 N.W.2d 703 (1982). After exhausting the available state remedies, Mr. Fencl raised three issues in his petition for habeas corpus: 1) that the prosecutor's references to Mr. Fencl's expressed desire to remain silent violated his fifth amendment privilege against self-incrimination and his sixth amendment right to counsel, 2) that

Mr. Fencl's pre-trial counsel was ineffective, and 3) that the trial court erred in giving Wisconsin Jury Instruction No. 1100. The district court denied Mr. Fencl's petition for habeas corpus, 628 F.Supp. 1379. For the reasons set forth in this opinion, we affirm the judgment of the district court.

### I

### Background

The Wisconsin Supreme Court summarized the facts underlying Mr. Fencl's conviction as follows:

Debra Sukowaty disappeared on September 24, 1977. On October 1, 1977, the police received a purse containing Sukowaty's identification and several other items which were found in a plastic bag in a nearby river. Among the items contained in the bag was a parking ticket, traceable to Ronald Fencl's car. Detective Geigel of the Two Rivers Police Department visited Fencl that same day to inquire about Sukowaty. Fencl stated that he did not know Sukowaty or anything about the items found in the river.

At approximately 4 p.m. on October 2, 1977, Geigel again visited Fencl. At this meeting Fencl told Geigel that he wanted to talk to his attorney and that he would get back to him. Half an hour later Fencl went to the police station. He told Geigel that he had found the items in his car and threw them into the river in order to avoid any trouble with the police. Geigel had to cut their conversation short because he received a call informing him that a body had been found in a nearby gravel pit. Fencl agreed to meet with him later that evening. In the meantime, the body was identified as Sukowaty. The police then impounded Fencl's car.

At 7 p.m. that same day, Fencl returned to the police station with his attorney, Steven Alpert. Fencl said nothing. His attorney spoke to Geigel only to ask why Fencl's car had been impounded. Two Manitowoc Police Department detectives talked to Fencl and gave him his *Miranda* rights. Fencl was al-

lowed to leave while the investigation continued. On November 4, 1977, a criminal warrant was issued charging Fencl with first-degree murder. He was arrested the next day. Alpert represented Fencl until just after the preliminary hearing. At that time new counsel was substituted because it appeared that Alpert might be called as a witness against Fencl.

During the trial the state made several references to Fencl's pre- and post-*Miranda* silence. In his opening statement the district attorney referred to the 4 p.m. meeting on October 2, 1977, between Detective Geigel and Fencl. He said that Fencl did not want to answer too many questions and that Fencl wanted to talk to his attorney. Detective Geigel also testified about this statement. Geigel testified three times about his 7 p.m., October 2, 1977, meeting with Fencl and Alpert. Each time Geigel indicated that Fencl said nothing. In his closing argument the district attorney once again referred to the 4 p.m. meeting of October 2, 1977, between Geigel and Fencl when he stated:

"He [Geigel] said as long as you're not mixed up in the disappearance of Debbie Sukowaty we're not interested in prosecuting. As long as your [sic] not interested. As long as you're not involved in Sukowaty's disappearance, that's alright [sic]. We're not interested in prosecuting you. He made that quite clear. At that point Fencl said that he wanted to talk to his lawyer, so Geigel left."

The jury found Fencl guilty of first-degree murder, and the court sentenced him to life imprisonment. Fencl moved for a new trial on September 4, 1979. During a hearing on this motion, it was revealed that Fencl's first attorney, Alpert, had engaged in some questionable practices in connection with his representation of Fencl. Nevertheless, the court denied Fencl's motion for a new trial by order entered October 27, 1980. Fencl's appeal of the judgment and the order was certified by the court of appeals and

accepted by this court pursuant to sec. 809.61, Stats.

*Fencl*, 325 N.W.2d at 705–06.

## II

### The District Court Opinion

The district court set forth the facts as found by the Wisconsin Supreme Court and determined that those findings were fairly supported by the record and adequate to rule on the issues presented.

#### A.

The district court first addressed Mr. Fencl's submission that the prosecution's references to his silence during questioning violated his fifth amendment right against self-incrimination, his sixth amendment right to assistance of counsel, and his fourteenth amendment right to due process. These references, which totaled six in number, took place during opening and closing arguments and during the prosecution's case-in-chief through the testimony of Detective Geigel. The court addressed separately those references to Mr. Fencl's silence that occurred after *Miranda* warnings had been given and those references that occurred before those warnings had been given.

The court first turned to post-*Miranda* events. Relying on *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed. 2d 623 (1986) and *Dean v. Young*, 777 F.2d 1239 (7th Cir.1985), *cert. denied*, 475 U.S. 1142, 106 S.Ct. 1794, 90 L.Ed.2d 339 (1986), the district court agreed with the Wisconsin Supreme Court that Detective Geigel's testimony that Mr. Fencl chose to remain silent after he had been given *Miranda* warnings violated his due process rights. *Fencl v. Abrahamson*, 628 F.Supp. 1379, 1384 (E.D.Wis.1986).

The district court next considered whether references to Mr. Fencl's prearrest, pre-*Miranda* silence violated his right not to incriminate himself under the fifth amend-

ment. The district court noted that prearrest silence may be used to impeach the credibility of a defendant who offers an exculpatory story when he testifies at trial. *See Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam); *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). The court observed that this case differs from *Fletcher* and *Jenkins* because Mr. Fencl chose not to testify at trial. Finding no guidance from the Supreme Court in such a situation,[1] the district court, without an extended analysis, decided that because Mr. Fencl chose not to testify at trial, references to his prearrest, pre-*Miranda* silence violated his right not to incriminate himself as guaranteed by the fifth amendment. *Fencl*, 628 F.Supp. at 1384–85.

The district court then considered whether the references to Mr. Fencl's prearrest silence constituted harmless error. In order to determine whether the references constituted harmless error, the district court considered five factors: 1) the intensity and frequency of the references, 2) which party elected to pursue the line of questioning, 3) the use to which the prosecution put the silence, 4) the trial judge's opportunity to grant a motion for a mistrial or to give a curative instruction, and 5) the quantum of other evidence indicative of guilt. *See Phelps v. Duckworth*, 772 F.2d 1410, 1413 (7th Cir.), *cert. denied*, 474 U.S. 1011, 106 S.Ct. 541, 88 L.Ed.2d 471 (1985). The district court found that the state demonstrated that the references to Mr. Fencl's silence were brief and isolated and mentioned as part of a narrative of the events preceding Mr. Fencl's arrest. The references were not used to prove any element of the crime, nor did defense counsel move for a mistrial. The district court found that there was no reasonable possibility that the references contributed to the conviction. Therefore, the district court concluded that the references constituted

---

1. In *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Supreme Court expressly declined to address whether a defendant's fifth amendment right is violated by references to pre-*Miranda* silence. The Court stated

that "[o]ur decision today does not consider whether or under what circumstances prearrest silence may be protected by the Fifth Amendment." *Id.* at 236 n. 2, 100 S.Ct. at 2128 n. 2.

harmless error. *Fencl,* 628 F.Supp. at 1385–87.[2]

### B.

The district court then addressed the second claim raised by Mr. Fencl—whether ineffective assistance by his pretrial counsel rendered his trial fundamentally unfair in violation of his due process rights. The district court decided that because most of the conduct complained of by Mr. Fencl had occurred prior to the initiation of adversary judicial proceedings, the sixth amendment right to counsel did not attach. The only conduct alleged by Mr. Fencl that violated his sixth amendment right to counsel that occurred after adversary proceedings had been initiated was defense counsel's alleged plan to write a book about the murder. Mr. Fencl also claimed that defense counsel tried to sell information to the district attorney. The district court found that Mr. Fencl did not show how this alleged conflict undermined the reliability of any proceedings prior to the defense counsel's withdrawal from the trial nor could the court find any mention of the book or sale of information in the transcript. The court accordingly held that Mr. Fencl had not met his burden of showing ineffective assistance of counsel under the *Strickland v. Washington*[3] standard. *Fencl,* 628 F.Supp. at 1388–89.

### C.

The district court then analyzed whether the trial court erred in giving the former Wisconsin Jury Instruction No. 1100. Mr.

Fencl claimed that the instruction impermissibly shifted the burden of proof on the element of intent to the defendant. Relying upon this court's holding in *Dean v. Young,* 777 F.2d 1239 (7th Cir.1985), *cert. denied,* 475 U.S. 1142, 106 S.Ct. 1794, 90 L.Ed.2d 339 (1986), the district court held that the jury instruction did not impermissibly assign a burden of proof to the accused. *Fencl,* 628 F.Supp. at 1389–90. The district court, therefore, denied Mr. Fencl's habeas corpus petition.

### III

### Analysis

#### A. References to Mr. Fencl's Silence

##### 1. Prearrest, Post-*Miranda* Silence

▉▉▉▉ Both the Wisconsin Supreme Court and the district court held that Detective Geigel's three references to Mr. Fencl's silence during the 7:00 p.m. meeting, after he had been given *Miranda* warnings, violated his due process rights.[4] Mr. Fencl renews that argument here. The respondent contends that the references to Mr. Fencl's silence at trial were "used primarily to establish the historical sequence of events. . . . The probative value of such evidence in a case where the petitioner did not testify, and where he gave exculpatory stories both before and after the 'silence' is so low as to have virtually no impact on the outcome." Respondent's Br. at 28–29.[5] We agree with both the Wisconsin Supreme Court and the district court that Mr. Fencl's due process rights were violated by

---

**2.** The district court, relying on *Dean v. Young,* 777 F.2d 1239 (7th Cir.1985), *cert. denied,* 475 U.S. 1142, 106 S.Ct. 1794, 90 L.Ed.2d 339 (1986), further held that Mr. Fencl's sixth amendment right to counsel was not violated by the prosecutor's references to his exercise of his right to counsel prior to being charged with murder. *Fencl v. Abrahamson,* 628 F.Supp. 1379, 1387–88 (E.D.Wis.1986).

**3.** 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**4.** Counsel for Mr. Fencl failed to object contemporaneously at trial to any of the references to Mr. Fencl's silence, although counsel did interpose a continuing objection before the start of the trial. *See* Tr. (Day 1) at 8–10. Generally,

this failure to object in state court would preclude federal review of an alleged error. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). However, because the Wisconsin appellate court considered the issue on the merits, it is not barred from federal review. *See Wainwright v. Greenfield,* 474 U.S. 284, 288–89 & n. 3, 106 S.Ct. 634, 637–38 & n. 3, 88 L.Ed.2d 623 (1986).

**5.** While these arguments do not convince us that there was no constitutional error, we do find these considerations to be relevant in our analysis of whether these references constituted harmless error. *See infra* part III, A.3.

the government's use of his prearrest, post–*Miranda* silence.

In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held that the prosecution could not use a defendant's postarrest silence to impeach an exculpatory story told for the first time at trial. *Id.* at 611, 96 S.Ct. at 2241. The Court stated that referring to the defendant's silence after he has been given *Miranda* warnings violates his due process rights. The rationale for this decision is that:

> Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* at 617–18, 96 S.Ct. at 2244–45 (footnotes and citation omitted).

The Supreme Court recently reaffirmed *Doyle*'s reasoning in *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), in a case where, like the one now before us, the reference to post–*Miranda* silence was introduced in the government's case-in-chief. In *Wainwright*, the Court held that the prosecution's introduction of the defendant's silence after receiving *Miranda* warnings as evidence of his sanity violated the due process clause. *Id.* at 295, 106 S.Ct. at 641. The Court stated that *"Doyle* and subsequent cases have ... made clear that breaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires." *Id.* at 291, 106 S.Ct. at 639; *see also Dean v. Young*, 777 F.2d at 1241; *United States v. Shue*, 766 F.2d

1122, 1128 (7th Cir.1985); *United States v. Caro*, 637 F.2d 869, 874–75 (2d Cir.1981).

Even more recently, in *Greer v. Miller*, — U.S. ——, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), the Court clarified that "the holding of *Doyle* is that the Due Process Clause bars *'the use* for impeachment purposes' of a defendant's postarrest silence." *Id.*, 107 S.Ct. at 3108 (quoting *Doyle*, 426 U.S. at 619, 96 S.Ct. at 2245) (emphasis in original). Thus, in *Greer*, where the trial court sustained an objection to the only question involving the defendant's postarrest silence, the Court held that no *Doyle* violation occurred because the defendant's postarrest silence "was not submitted to the jury as evidence from which it was allowed to draw any permissible inference." *Id.* Therefore, we conclude, in accordance with precedent of the Supreme Court and of this court, that the repeated references to the petitioner's post–*Miranda* silence during the government's case-in-chief violated the due process clause.

2. Prearrest, Pre–*Miranda* Silence

Both the Wisconsin Supreme Court and the district court held that references to Mr. Fencl's silence before he had been given *Miranda* warnings violated his fifth amendment right not to incriminate himself. These references involved Mr. Fencl's two encounters with Detective Geigel on Sunday, October 2. The respondent, relying on *United States v. Harrold*, 796 F.2d 1275 (10th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 892, 93 L.Ed.2d 844 (1987), argues that "there is no independent fifth amendment protection for silence in a prearrest, pre–*Miranda* situation if there was no governmental action which induced the silence." Respondent's Br. at 14. Further, the respondent contends that the petitioner may have waived any fifth amendment right by offering exculpatory stories to the police prior to and after he stated his desire to consult an attorney. At 4:00 p.m. on October 2, the petitioner did not respond to Detective Geigel's questions about the victim's belongings found in his car. However, at 4:30 p.m., Mr. Fencl stated to Detective Geigel that he

had found the victim's belongings in his car and had thrown them in a trash bag into the river. Mr. Fencl further offered an explanation for their appearance in his car —he suggested that he had experienced problems with people opening the vent window of his car and breaking into it. The respondent maintains that "the petitioner waived at 4:30 whatever fifth amendment right to silence he may have invoked at 4:00 p.m. that same day. The state submits that it was the 4:30 statement, and not the 'silence' one-half hour earlier, that prejudiced the defense at trial." Respondent's Br. at 19.

■ It is firmly established that neither the fifth amendment nor the fourteenth amendment is violated by the government's use of prearrest silence to impeach a defendant's credibility when he testifies at trial. *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). When a defendant testifies at trial, the fifth amendment is not violated because "impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." *Id.* at 238, 100 S.Ct. at 2129. The right to fundamental fairness guaranteed by the due process clause is not violated in this situation, because unlike the *Doyle* situation where *Miranda* warnings have been given, in this situation, "no governmental action induced petitioner to remain silent before arrest." *Id.* at 240, 100 S.Ct. at 2130; *see also Fletcher v. Weir,* 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982) (per curiam) ("In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand.").

As noted by the Wisconsin Supreme Court and the district court, this case presents a different question than either *Jenkins* or *Fletcher* because the petitioner chose not to testify at trial. The Supreme Court has yet to address the precise question of whether the prosecution's reference to pre–*Miranda* silence in its case-in-chief violates the fifth amendment. The Tenth Circuit, in *United States v. Harrold,* 796 F.2d 1275 (10th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 892, 93 L.Ed.2d 844 (1987), has held that "comment on a defendant's silence is error only when the defendant remained silent in reliance on government action, *i.e.,* a *Miranda* warning." *Id.* at 1279. The court then held that testimony elicited by the government about the defendant's pre–*Miranda* reliance on the fifth amendment was proper. *Id.* Other courts have declined to decide the question because in those cases, the references to the defendant's silence were harmless beyond a reasonable doubt. *See United States v. Blanton,* 730 F.2d 1425, 1433–34 (11th Cir.1984); *United States v. Caro,* 637 F.2d 869, 876 (2d Cir.1981). In *Caro,* however, the Second Circuit suggested that references to the defendant's silence during the government's direct case are improper. "[W]e are not confident that *Jenkins* permits even evidence that a suspect remained silent before he was arrested or taken into custody to be used in the Government's case in chief.... [A]ll of the cases permitting proof of silence, including *Jenkins,* have involved impeachment or rebuttal of the defendant's testimony." *Id.* at 876. We need not decide this question today, however, because our determination rests on the harmless error doctrine.

### 3. Harmless Error

■ The petitioner contends that the prosecution's references to his prearrest silence did not constitute harmless error.[6] In order to evaluate this claim, we must

**6.** There has been some discussion over the appropriate standard of review for the consideration of *Doyle* violations in habeas cases. The question presented to the Supreme Court for review in *Greer v. Miller* in the petition for certiorari was: "Whether, when considering violations of *Doyle v. Ohio* in federal habeas corpus proceedings, the standard of review should be

whether the error substantially affected the course of the trial rather than whether the error was harmless beyond a reasonable doubt." *Greer v. Miller,* —— U.S. ——, 107 S.Ct. 3102, 3106 n. 3, 97 L.Ed.2d 618 (1987). However, because the Court held that no *Doyle* violation occurred, it did not reach the question of the appropriate standard of review.

explore the intensity and frequency of the references at trial, which party pursued this line of questioning, the use to which the prosecution put the silence, the trial judge's opportunity to grant a motion for a mistrial or to give curative instructions, and the quantum of other evidence indicative of guilt. *See Phelps v. Duckworth,* 772 F.2d 1410, 1413 (7th Cir.), *cert. denied,* 474 U.S. 1011, 106 S.Ct. 541, 88 L.Ed.2d 471 (1985); *see also United States v. Schmitt,* 794 F.2d 555, 559 (10th Cir.1986). This examination requires us to review the references at trial to Mr. Fencl's silence in some detail.

There were six references to Mr. Fencl's prearrest silence during the five-day trial. The first reference was made by the prosecutor during the opening argument. In his opening statement, the prosecutor related that Detective Geigel "went to talk to Ron Fencl again over at Mr. Dent's house. And this time Ron Fencl didn't want to answer too many questions. He said I want to talk to my lawyer first and then maybe I'll talk to you." Tr. (Day 2) at 188.

During the government's case-in-chief, Detective Geigel referred four times to Mr. Fencl's silence. The first reference occurred when the prosecutor asked Mr. Geigel how Mr. Fencl responded to his explanation that the police were looking for a missing woman during their initial meeting on October 2. Detective Geigel stated, "he was very friendly. He said I want to talk to my lawyer and I'll get back to you later." Tr. (Day 3) at 177. The second reference occurred when Mr. Geigel was testifying about the October 2 evening interview with Mr. Fencl, during which interview Mr. Fencl had been given *Miranda* warnings.

> Q. And did Mr. Fencl—did he come back at that time, at 7?
>
> A. Yes. He came back with his Attorney Steve Alpert.
>
> \* \* \* \* \* \*
>
> Q. And at that time did Mr. Fencl make any statements to you in regards to the missing girl?

In accordance with this circuit's precedent, we will apply the harmless error standard to this case. *See, e.g., Phelps v. Duckworth,* 772

> A. No sir.

Tr. (Day 3) at 186–87. Mr. Geigel's third reference to Mr. Fencl's silence occurred when he was describing the third meeting with Mr. Fencl.

> Q. What about the third meeting?
>
> A. The third meeting he said nothing.

Tr. (Day 3) at 196. Finally, in response to a question by the court, Mr. Geigel made another reference to Mr. Fencl's silence:

> THE COURT: You had another meeting with him?
>
> THE WITNESS: We had prearranged a meeting for 7 p.m., but at this time he came in with his attorney and he didn't say a word; his attorney did all the talking.

Tr. (Day 3) at 198. During the closing argument, the prosecutor referred once again to Mr. Fencl's silence:

> He said as long as you're not mixed up in the disappearance of Debbie Sukowaty we're not interested in prosecuting. As long as your [sic] not interested. As long as you're not involved in Debbie Sukowaty's disappearance, that's alright [sic]. We're not interested in prosecuting you. He made that quite clear. At that point Fencl said he wanted to talk to his lawyer, so Geigel left.

Tr. (Day 5) at 15.

The petitioner contends that the prosecutor repeatedly used Detective Geigel's testimony to imply that Mr. Fencl was guilty of murder because he would not answer questions and wanted to talk to his attorney. The petitioner further argues that these references to his silence did not constitute harmless error, especially in view of the fact that the prosecution's case was supported by weak, circumstantial evidence. The state contends that the references to Mr. Fencl's silence were not used to prove elements of the crime but were merely used to discredit Mr. Fencl's exculpatory story. Further, argues the state, the references to the silence were not used to imply guilt, but rather to explain the sequence of events.

F.2d 1410, 1413 (7th Cir.), *cert. denied,* 474 U.S. 1011, 106 S.Ct. 541, 88 L.Ed.2d 471 (1985).

"Constitutional error is reversible error unless it is harmless beyond a reasonable doubt." *United States v. Shue*, 766 F.2d 1122, 1132 (7th Cir.1985). The government bears the burden of proving that a constitutional error is harmless. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). As the Supreme Court stated in *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986):

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

*Id.* 106 S.Ct. at 3105–06 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 1436–37, 89 L.Ed.2d 674 (1986)) (citations omitted). "[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Van Arsdall*, 106 S.Ct. at 1436.

Several factors support Mr. Fencl's argument that the error was not harmless when evaluated under the *Chapman* standard. As the district court quite candidly noted, the evidence against Mr. Fencl was not overwhelming. However, as the Supreme Court of Wisconsin determined, "there was sufficient evidence to support Fencl's conviction." *Fencl*, 325 N.W.2d at 712.[7] We also note that the Supreme Court of Wisconsin concluded that the prosecution's inquiry with respect to the post-*Miranda* events "were intended to suggest 'a tacit admission of guilt on the part of the defendant.'" *Id.* at 710 (quoting *Reichhoff v. State*, 76 Wis.2d 375, 251 N.W.2d 470, 472 (1977)). However, the court seemed to temper that statement in its discussion of harmless error, when it noted that "[t]he state did not make a concentrated, overt effort to imply Fencl's guilt through references to his silence." *Id.* at 712. It is not

---

7. Our independent review of the record convinces us that there is no reasonable likelihood that the references to Mr. Fencl's silence contributed to his conviction. The evidence presented by the state showed that on the evening of September 23, 1977, Mr. Fencl and his friend, Mr. Dent, drove around Two Rivers in Mr. Fencl's 1966 Chevrolet and stopped at several different taverns to buy and drink beer. Mr. Dent testified that he and Mr. Fencl were "looking for women." Tr. (Day 4) at 14. Mr. Fencl dropped Mr. Dent off at his home at approximately 4:15 a.m. and told Mr. Dent that he was heading home to Manitowoc. Mr. Fencl had a flat tire on his way home and therefore returned to Two Rivers to pick up his 1962 Chevrolet. Mr. Fencl had told Detective Geigel that he arrived home in Manitowoc at 5 a.m.

The testimony adduced at trial indicated that Ms. Sukowaty was scheduled to work at the Big Boy Restaurant at 5:30 a.m. on September 24. One of her friends testified that she generally walked to work dressed in her uniform. The route that she habitually walked passed the Hotel Howard. Mr. Dent testified that Mr. Fencl lived in the Hotel Howard during September 1977 and Mr. Fencl told Detective Geigel that he had parked in front of the hotel from 5 a.m. to 2 p.m. on September 24. A parking ticket retrieved from Mr. Fencl's car indicated that he was parked in front of the Hotel Howard at 10:51 a.m. on September 24. Ms. Sukowaty did not arrive at work on the morning of September 24.

On September 26, a boy who was fishing found a plastic garbage bag containing a purse with Ms. Sukowaty's identification, her uniform apron, several other items, and a parking ticket traced to Mr. Fencl's car. When Detective Geigel asked Mr. Fencl about the items found in the bag, he initially denied any knowledge of them. However, he later admitted to the detective that he found the items in his car at about 2 p.m. on September 24 and threw them in the river. Further, while he initially denied that he knew the victim, there was some evidence at trial that he had been seen with her on one occasion.

The victim's body was discovered on October 2 in a gravel pit. Testimony at trial revealed that Mr. Fencl had previously gone to the gravel pit area on several occasions with his girlfriend "to park." Tr. (Day 4) at 43. Forensic evidence indicated that a hair was found in the back seat of Mr. Fencl's 1962 Chevrolet that "to a reasonable degree of scientific certainty" was similar to Ms. Sukowaty's hair. Tr. (Day 4) at 103. The victim died from at least three forceful blows to the skull. The pathologist determined that there was no blood on any part of the body except on the clothing about the shoulders. The absence of blood elsewhere on the body indicated that the victim had been killed at the spot where the body had been found. The pathologist testified that the victim's blood had drained out of the skull into the ground. The pathologist estimated that he performed the autopsy eight days after the victim had died.

unusual, in a case such as this one, for the government's case to be grounded on circumstantial evidence and to be dependent, at least to some degree, on the demeanor of the witnesses.

More important, our task, in assessing whether the error was harmless beyond a reasonable doubt is not to engage simply in a reweighing of the evidence. Rather, as the court made clear in *Phelps v. Duckworth*, 772 F.2d 1410 (7th Cir.), *cert. denied*, 474 U.S. 1011, 106 S.Ct. 541, 88 L.Ed. 2d 471 (1985), we must assess, as precisely as we can, the impact of the objectionable material on the jury's verdict. The references to Mr. Fencl's silence were brief. Moreover, when viewed as part of the entire record, these references play a rather minor role in the government's presentation of its case. These references did not, of course, directly establish any element of the charged offense. The majority of the references were made during the witness's narration of a sequence of events designed to show that, during the course of the investigation, Mr. Fencl voluntarily told the authorities inconsistent stories. *See generally* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 401[10], at 401–70 to 401–71 (1986) (discussion of the use of false exculpatory statements to show consciousness of guilt). Thus, the prosecutor was primarily emphasizing that Mr. Fencl affirmatively attempted to mislead the investigation—not that he relied on his right to remain silent. While the defense counsel had interposed a continuing objection before trial, which was sufficient under state law to preserve the issue, it is not without some significance, in assessing the import of the testimony, that he did not object further or move for a mistrial. Further, the trial judge instructed the jury both before the opening statements and in the final jury instructions that they were not to consider any statements made by counsel during the trial as evidence. Tr. (Day 2) at 178; Tr. (Day 5) at 49; *see United States v. Alvarado*, 806 F.2d 566, 575 (5th Cir.1986). Accordingly, we conclude that the govern-

ment has satisfied its burden of showing that the jury would have convicted Mr. Fencl absent the improper references to his silence and thus the errors were harmless beyond a reasonable doubt.

### B. *Ineffective Assistance of Counsel*

■ The petitioner contends that his pretrial counsel's activities prejudiced his defense and that his counsel's conduct raised a reasonable probability that the result of the trial would have been different had his attorney's performance not been deficient. The petitioner claims that he "might never have been charged except for [his attorney's] conduct and advice which tended to feed and encourage any suspicions the authorities might have had regarding Mr. Fencl's possible involvement in Ms. Sukowaty's death." Petitioner's Br. at 23. Further, the petitioner maintains that the contradictory stories he told the police about his knowledge concerning the victim's belongings resulted from the advice he received from his pre-trial counsel. These contradictory stories were prejudicial to his defense, argues the petitioner, because they were used by the prosecution to imply that he was involved in a "coverup."

In view of the Supreme Court's decision in *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 1145, 89 L.Ed.2d 410 (1986), holding that the sixth amendment right to counsel does not attach until the first formal charging proceeding,[8] the petitioner no longer bases his ineffectiveness claim on the sixth amendment. Rather, he contends that his pre-trial attorney's conduct deprived him of a fair trial in violation of the due process clause. We find this claim to be without merit. Mr. Fencl has not shown that the government acted in a way that was so offensive as to deprive him of the fundamental fairness guaranteed by the due process clause. Indeed, his suggestion as to how his attorney's purported conduct affected the later proceeding is largely speculative. Therefore, we uphold the district court's determination that the petitioner's rights to due process and to the effec-

---

8. Mr. Fencl now concedes that all of the events underlying this claim of ineffective assistance of counsel took place before he was charged. Appellant's Br. at 19. The district court had under-stood that one of the events, his attorney's plan to write a book, occurred after the charge had been made.

tive assistance of counsel were not violated in this case.

### C. *Constitutionality of Jury Instruction No. 1100*

■ The petitioner contends that the presumption jury instruction impermissibly shifted the burden to him to disprove "an intent to kill once the State had proved that he had caused the death of the victim or had used a dangerous weapon likely to kill in an assault on the victim which caused his death." Petitioner's Br. at 35–36. The instruction given to the jury provided:

When there are no circumstances to prevent or rebut the presumption, the law presumes that a reasonable person intends all of the natural, probable, and usual consequences of his deliberate acts. If one person assaults another violently with a dangerous weapon likely to kill, and the person thus assaulted dies therefrom, then, when there are no circumstances to prevent or rebut the presumption, the legal and natural presumption is that death was intended.

Tr. (Day 5) at 44. This court has upheld the constitutionality of this instruction twice. *See Dean v. Young,* 777 F.2d at 1243–44; *Pigee v. Israel,* 670 F.2d 690, 694–95 (7th Cir.), *cert. denied,* 459 U.S. 846, 103 S.Ct. 103, 74 L.Ed.2d 93 (1982). In *Dean,* this court upheld the earlier decision in *Pigee* in light of *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). In *Francis,* the Supreme Court held that a jury instruction violated the fourteenth amendment's requirement that the government prove beyond a reasonable doubt every element of a criminal offense because the instruction there in question created a mandatory presumption whereby the jury had to infer intent after the government proved certain predicate acts. *Id.* at 325, 105 S.Ct. at 1977. In *Dean,* this court provided four reasons why Instruction No. 1100 is still valid after *Francis:* 1) "the instruction refers to the consequences of a 'deliberate' act, not … a 'voluntary' one," 2) "the instruction refers to the intent of a 'reasonable' person, not … 'any person,'" 3) "the presumption is dispelled by *any* evidence …, and such a bursting-bubble instruction is the equivalent of the permissive inference sustained in *Ulster County Court v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979)," and 4) "the instruction refers to 'circumstances' but does not say who has the burden of making these 'circumstances' appear, and it is therefore not necessarily read as throwing a burden on the defendant." *Dean,* 777 F.2d at 1244 (emphasis in original). We see no reason at this juncture to overturn the controlling precedent of this circuit. Accordingly, we agree with the district court that no constitutional error was committed by the trial court by giving Jury Instruction No. 1100.

### Conclusion

Any error resulting from references to Mr. Fencl's silence during trial was harmless beyond a reasonable doubt. Further, Mr. Fencl's rights to the effective assistance of counsel and to a fair trial were not violated by his pretrial counsel's conduct. In addition, the trial court did not err by giving Jury Instruction No. 1100. Accordingly, we affirm the judgment of the district court denying Mr. Fencl's petition for a writ of habeas corpus.

AFFIRMED.