**Steve L. HUNTER, Petitioner–Appellee,**

v.

**Richard CLARK and Indiana Attorney General, Respondents–Appellants.**

**No. 89–2594.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1990.

Decided July 3, 1990.

Order on Grant of Rehearing Sept. 17, 1990.

Robert W. Hammerle, Allen, Baratz, Conway & Hammerle, Indianapolis, Ind., for petitioner-appellee.

Kirk A. Knoll and Ronald J. Semler, Deputy Attys. Gen., Office of the Atty. Gen., Indianapolis, Ind., for respondents-appellants.

Before COFFEY, FLAUM and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Richard Clark, Superintendent of the Indiana State Prison, and the Indiana Attorney General appeal the district court's grant of Steve L. Hunter's petition for writ of habeas corpus. The district court granted the petition for habeas corpus on the ground that the Indiana state trial court's refusal to provide Hunter with his requested instruction that the jury make no adverse inference from Hunter's failure to testify violated Hunter's privilege against self-incrimination under the fifth and fourteenth amendments of the United States Constitution. We reverse.

I.

At approximately 11 a.m. on January 24, 1984, Steve L. Hunter entered the Indiana National Bank branch located at 62nd Street and Michigan Road in Indianapolis, Indiana. At this time Hunter was unmasked and inquired of bank teller Phyllis Jones concerning the possibility of opening a savings account. Mrs. Jones invited Hunter to take a seat, but instead, he walked directly into the bank manager's office, pointed a silver handgun at the manager and informed him that a robbery was occurring. Hunter then pulled a ski mask over his face. Phyllis Jones, a bank teller, had an opportunity to observe Hunter's face before he donned the mask and was thus able to identify Hunter at trial as the man who wielded the silver handgun. Shortly thereafter, Hunter's two accomplices, armed with shotguns, burst into the bank and ordered all present to touch neither buttons nor alarms. Hunter ordered the bank manager, Dewey Cain, to enter the tellers' stations and remove money

from the tellers' drawers. Mr. Cain removed approximately $14,000 from three tellers' drawers and placed it in a pillowcase provided by Hunter. Included in the loot was a dye pack and "bait money" from Phyllis Jones' drawer. When the "bait money" was removed from the teller's drawer, it set off an alarm and activated the bank's cameras. In addition, when the "bait money" left the bank, a dye pack with a triggering device hidden in the bait money was automatically activated by a radio and exploded as the dye pack left the bank premises. Red dye was sprayed over the cash the robbers had stolen.

When Hunter and his two accomplices left the bank, they took car keys from one of the bank's customers. They forced the bank's assistant manager at gunpoint to give up his car keys and to precede them out the door. The men stole a van parked in the bank's parking lot with its engine running and left the crime scene. Later, the robbers abandoned the van and attempted to steal another vehicle, but failed when that car got stuck in a ditch. Shortly thereafter, they were successful in stealing a different car after forcing the owner from his car with a "nickel-plated" pistol.

Later that day, Hunter, along with his co-defendant Charles Hatcher, and a third man named Lynell Beard, went to the home of a friend, Howard Smith. Hatcher had earlier borrowed a chrome pistol and a shotgun from Smith in exchange for a portion of the money to be taken in the robbery. At this time Hunter, Hatcher and Beard dumped the loot, stained with red dye, on the table in Smith's house and proceeded to count the money. While counting the money, the men heard and observed a TV news account of the robbery that included a statement by a witness who recounted that he had been beaten, robbed and forced from his car. At this time Hunter stated to Beard, Hatcher and Smith that the witness interviewed on the news had not been touched and was lying about the details of that day's events and admit-

ted further that he had pulled a pistol on the bank manager. Each of the three men gave Smith $100 ($300 total), all of which was stained with red dye. Smith and another accomplice, Hunter's cousin, Anthony Thompson, attempted to remove red dye stains from the money but were unsuccessful. At trial Thompson also testified that Hunter had telephoned him on the morning of the robbery and asked him whether he wished to "make some money," but Hunter refused because of concerns over his probation status from a previous robbery conviction.

On the following day, January 25, 1984, Marion County Sheriff Sergeant Ron Beasley arrested Smith in his automobile. Smith had money stained with red dye in his possession. During questioning, Smith revealed his home address to Sergeant Beasley. After Smith was transported to the Marion County Sheriff's Department, Sergeant Beasley proceeded directly to Smith's home where he met Felicia Wilson, the lessee of the apartment. Beasley advised her that the police "believed that there was evidence from this bank robbery that could be obtained in a search of her apartment," and asked for permission to conduct a search of the premises. Wilson signed a waiver permitting the search. In the course of the search of the apartment, police came upon a semi-automatic rifle, a sawed-off shotgun, a silver revolver and a used bar of soap stained with red dye.

Hunter was subsequently charged with five counts of robbery and one count of confinement[1] and was tried jointly with a co-defendant, Charles Hatcher, in an Indiana state court. During the trial Hunter did not take the stand in his own defense. At the close of the evidence, Hunter requested that the jury be instructed that they were not to make any adverse inferences from Hunter's failure to testify. However, co-defendant Hatcher requested that this instruction not be given. The state court judge at trial, confronted with

---

1. Indiana's "criminal confinement" offense, found in Ind.Stat.Ann. § 35–42–3–3, was "[c]arved from the previous statutory definition" of kidnapping, and is "punishable by a significantly less severe penalty" than kidnapping. *Owens v. State,* 419 N.E.2d 969, 970 (Ind. 1981).

this dilemma, offered to sever the defendants', Hunter and Hatcher's, trials in order that he might accommodate their respective requests for conflicting jury instructions. The trial judge, upon being forced to make a choice between the requests of the individual co-defendants, elected not to give the jury instruction concerning the drawing of the "no adverse inference" Hunter requested. The jury convicted Hunter of five counts of robbery and one count of confinement. Hunter was sentenced to six consecutive 20–year terms of imprisonment for each of the five robbery counts and the confinement count (120 years total).

Hunter appealed his convictions and sentences to the Indiana Supreme Court. In affirming Hunter's convictions, the Indiana Supreme Court rejected Hunter's allegations of error concerning the trial court's refusal to give his "no adverse inference" instruction. After recounting the facts of the case, including the divergent requests of the jointly tried co-defendants regarding the furnishing of a "no adverse inference" instruction, the Indiana court stated:

> "By his actions here, Hunter placed the trial court on the horns of a dilemma which made it impossible for it to refrain from committing error. The trial court gave Hunter the opportunity to resolve this dilemma by offering to sever the trials as Hatcher had, in fact, requested, but Hunter declined to accept that alternative. He therefore has waived any error the court might have committed in resolving the matter as he did."

*Hunter v. State*, 492 N.E.2d 1067, 1069 (Ind.1986).

Two years later, on October 26, 1988, Hunter filed this habeas corpus petition alleging that "his Fifth Amendment rights were violated when the state trial court refused to give his tendered 'failure to testify' instruction." *Hunter v. Duckworth*, 741 F.Supp. 1338, 1340 (N.D.Ind. 1989). The district court granted Hunter's habeas corpus petition, ruling in contravention of the Indiana Supreme Court's decision, and held that there was no waiver of

the "failure to testify" or "no adverse inference" instruction issue because "[t]his court cannot find an Indiana court rule or statute which requires a defendant to move for a severance or to accept an offer of severance in order to preserve the 'failure to testify' issue." *Id.* at 1341. The district court went on to hold that Hunter's federal fifth amendment rights were violated when the state trial court chose to enforce his co-defendant's state constitutional right not to have a "failure to testify" instruction given over Hunter's federal constitutional right to such an instruction.

> "When a state constitutional right unavoidably conflicts with a federal constitutional right, the state right must give way to the federal right under the mandates of the Supremacy Clause of the Constitution of the United States. *See, e.g., Reynolds v. Sims*, 377 U.S. 533, 584 [84 S.Ct. 1362, 1393, 12 L.Ed.2d 506] (1964). Consequently, in this joint state trial, the petitioner's Fifth Amendment right to request a 'failure to testify' instruction should have prevailed over co-defendant Hatcher's state constitutional right not to have the instruction given. *See Lucas* [*v. State*, 499 N.E.2d 1090, 1093 (Ind.1986)] (where the Supreme Court of Indiana held the same). Thus, the petitioner's Fifth Amendment rights were violated when the state trial court refused to give his tendered 'failure to testify' instruction."

*Hunter*, at 1342. Lastly, the district court held that the state trial court's failure to provide the jury with the "no adverse inference" instruction was not "harmless error" because "the evidence supporting [Hunter's] convictions is not 'overwhelming.'" *Id.* at 1343. The court believed that the facts that only one witness positively identified Hunter as one of the bank robbers and the state's extensive reliance upon accomplice testimony of accessories after the fact necessitated a conclusion that the evidence in favor of Hunter's conviction was not overwhelming. Reasoning further he held that "the state trial court's error in refusing to give the requested 'failure to testify' instruction is not harmless beyond a reasonable doubt." *Id.* at 1345.

## II.

In *Carter v. Kentucky*, 450 U.S. 288, 300, 101 S.Ct. 1112, 1119, 67 L.Ed.2d 241 (1981), the United States Supreme Court held that "[t]he principles enunciated in our cases construing [the privilege against compulsory self-incrimination] lead unmistakably to the conclusion that the Fifth Amendment requires that a criminal trial judge must give a single 'no adverse inference' jury instruction when requested by defendant to do so." Conversely, the Supreme Court has held that "the giving of [a no-adverse inference] instruction over the defendant's objection does *not* violate the privilege against compulsory self-incrimination guaranteed by the Fifth and Fourteenth Amendments." *Lakeside v. Oregon*, 435 U.S. 333, 340–41, 98 S.Ct. 1091, 1095–96, 55 L.Ed.2d 319 (1978) (footnote omitted, emphasis added). Nonetheless, the Supreme Court in *Lakeside* also noted that: "It may be wise for a trial judge not to give such a cautionary instruction over a defendant's objection. And each State is, of course, free to forbid its trial judges from doing so as a matter of state law." *Id.* at 340, 98 S.Ct. at 1095. Prior to *Lakeside* the Indiana Supreme Court had guaranteed criminal defendants the right not to receive a "no adverse inference" instruction if they so chose. *Gross v. State*, 261 Ind. 489, 306 N.E.2d 371, 372–73 (Ind. 1974).[2] Following *Lakeside*, the Indiana Supreme Court explicitly grounded this right in the Indiana Constitution, holding:

"With due regard for our responsibilities as state judges, we have re-examined our holding in *Gross* and *Hill* [*v. State*, 371 N.E.2d 1303 (Ind.1978)] in light of reasoning and evaluation of interests revealed in *Lakeside*. Having done so, we remain convinced that the basic premises of this Court's reasoning in *Gross* and *Hill* are sound and that the mechanism erected therein for the accused to choose whether to have the jury given an in-

struction regarding his failure to testify is a requisite for full realization of the right of each citizen granted by Article I, Section XIV [of the Indiana Constitution] that 'no person, in any criminal prosecution, shall be compelled to testify against himself.' "

*Priest v. State*, 270 Ind. 449, 386 N.E.2d 686, 689 (Ind.1979). Therefore, "in Indiana the choice of whether or not the trial court instructs the jury on the defendant's failure to testify belongs to the defendant." *Parker v. State*, 425 N.E.2d 628, 630 (Ind. 1981).

Obviously, this type of problem arises only where there is a multiple-defendant trial and the defendants have divergent interests with respect to the "no adverse inference" instruction. In a multiple-defendant trial, when the court cannot accommodate the conflicting interests involved in one defendant's federal constitutional right to receive a "no adverse inference" instruction and another defendant's state constitutional right not to receive such an instruction, the Indiana Supreme Court has properly determined that the "Fifth Amendment right to an instruction warning the jury not to draw any adverse inferences from his silence must prevail over the right that this Court has granted under the Indiana Constitution to decide whether it suits [a defendant] to have such an instruction given or not." *Lucas v. State*, 499 N.E.2d 1090, 1093 (Ind.1986).

In Hunter's case, unlike *Lucas*, the state trial court opted to honor the request of Hunter's co-defendant that it refrain from providing a "no adverse inference" instruction rather than Hunter's request for such an instruction. We are convinced that, under the facts of this case, the court acted properly. Both the Indiana Supreme Court[3] and the district court[4] made separate findings and stated that the Indiana trial court offered Hunter the opportunity to have his case severed from his co-defen-

---

**2.** In *Gross* the Indiana Supreme Court appeared to base its holding upon the Fifth Amendment to the United States Constitution. *See* 306 N.E.2d at 372–73. Obviously, this rationale could not survive the United States Supreme Court's refusal to recognize a Fifth Amendment

right *not* to receive a "no adverse inference" instruction in *Lakeside*.

**3.** *Hunter v. State*, 492 N.E.2d at 1068–69.

**4.** *Hunter v. Duckworth*, at 1342 n. 1.

dant's, but he refused severance. Based upon our examination of the record, we conclude that these factual determinations were free from clear error. *See Walton v. Lane*, 852 F.2d 268, 272 (7th Cir.1988) (state court factual determinations are presumed correct in a federal habeas corpus proceeding and a "federal court[ ] [may] make a contrary finding of fact only if 'on a consideration of ... the record as a whole [the federal court] concludes that such factual determination is not fairly supported by the record.' 28 U.S.C. § 2254(d)(8)."). Presented with the need to reconcile two jointly tried defendants' conflicting rights, the state trial court devised and offered a logical and legally acceptable solution (severance) that would have protected both Hunter's federal constitutional right to receive a "no adverse inference" instruction and his co-defendant's right not to receive such an instruction. In failing to agree to the trial court's proposed solution, Hunter, the petitioner-appellee, effectively waived his right to complain and his right to a "no adverse inference" instruction. The Sixth and Eighth Circuits have observed that a " 'trial judge can not be faulted for any trial mishaps that he offers to and could correct.' " *United States v. Feroni*, 655 F.2d 707, 712 (6th Cir.1981) (quoting *United States v. Splain*, 545 F.2d 1131, 1133 (8th Cir.1976)). We agree with the Sixth and Eighth Circuits and hold that the state trial court's offer of a separate trial would have allowed Hunter to receive his requested "no adverse inference" instruction and would have avoided any prejudice accompanying his failure to receive such an instruction in his joint trial. As the Supreme Court and this court have often stated: "The Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *Dortch v. O'Leary*, 863 F.2d 1337, 1346 (7th Cir.1988).

The dissent argues that "the trial judge deviated from established Supreme Court precedent and in doing so violated Hunter's constitutional right to receive the 'no adverse inference' instruction." Dissent at 311. Interestingly, the dissent admits that:

"The majority is correct in suggesting that the 'court devised and offered a logical and legally acceptable solution (severance) that would have protected both Hunter's federal constitutional right to receive a no adverse inference instruction and his co-defendant's [state] right not to receive an instruction.' " Dissent at 312 (quoting Majority Opinion at 306–307). The dissent also agrees that: "Faced with the competing demands of the defendants in this case, the trial court's remedy of severance was [a] reasonable one since it would have accorded each of the defendants what they sought." Dissent at 311. In light of the dissent's recognition that the trial court's proposed severance would have preserved Hunter's constitutional right to a "no adverse inference" instruction, we have great difficulty understanding the dissent's position that the Supreme Court's decisions in *Carter, Lakeside* and *James v. Kentucky*, 466 U.S. 341, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1981), should be construed to require a conclusion that a defendant has a right to insist upon his preferred means of vindicating his constitutional right (reception of the "no adverse inference" instruction in the joint trial).

The effect of the dissent's reasoning is to extend the right to a "no adverse inference" instruction beyond a simple right to receive such an instruction to a right to refuse any trial court procedural solution to preserve the right to a "no adverse inference" instruction through a trial mechanism that is not of the defendant's preference. In support of its position regarding the "absolute" nature of a defendant's right to a "no adverse inference" instruction, the dissent at page 310 quotes the first half of a sentence from *James v. Kentucky*, 466 U.S. at 350, 104 S.Ct. at 1836: "The Constitution obliges the trial judge to tell the jury, in an effective manner, not to draw the inference if the defendant so requests...." The dissent, however, omits the second half of the Supreme Court's sentence in *James* which modifies this right with the statement "but it [the Constitution] does not afford the defendant

the right to dictate, inconsistent with state practice, *how* the jury is to be told." *James,* 466 U.S. at 350, 104 S.Ct. at 1836 (emphasis in original). In our view, Hunter's refusal of the trial court's determination that Hunter would receive his right to a no adverse inference instruction in a "severed" proceeding represents an attempt to dictate the specific manner in which his right to a no adverse inference instruction would be vindicated, an attempt that does not constitute a legitimate part of Hunter's federal constitutional right to such an instruction. We also note that none of the "clearly established Supreme Court precedent" [5] to which the dissent refers—namely, *James, Carter,* and *Lakeside*—involved joint trials of co-defendants making conflicting requests as to the "no adverse inference" instruction. We therefore refuse to condone Hunter's blatant attempt to orchestrate the state trial proceedings to his own benefit. Indeed, it is apparent that Hunter was trying to manipulate the trial court into committing reversible error in order to obtain a new trial. We will not be a party to such callous disregard for the overburdened dockets of both the state and federal courts. The trial court offered Hunter a viable solution to his request for a "no adverse inference" instruction, and we are aware of no case requiring a trial court to comply with a manipulative defendant's stated preference of the means for preserving his or her constitutional rights.[6] Thus, we hold that the state trial court did not violate Hunter's fifth amendment rights.

### III.

■ Even if we agreed that the state trial court's failure to provide a no adverse inference instruction deprived Hunter of rights protected under the federal Constitution, which we do not, there would remain a question of whether such an error would justify the reversal of Hunter's conviction.

The United States Supreme Court has not decided as of this date whether a reviewing court may disregard a trial court's constitutionally improper failure to provide a "no adverse inference" instruction in a similar factual situation if this error is harmless beyond a reasonable doubt. *See Carter,* 450 U.S. at 304, 101 S.Ct. at 1121 ("While it is arguable that a refusal to give [a no adverse inference] instruction similar to the one that was requested here can never be harmless, we decline to reach the issue, because it was not presented to or considered by the Supreme Court of Kentucky.") (citation omitted). However, the federal courts of appeals that have reached this question have unanimously held that a constitutionally erroneous failure to provide a "no adverse inference" instruction may be disregarded if the error was harmless beyond a reasonable doubt. *See Finney v. Rothgerber,* 751 F.2d 858, 864 (6th Cir.), *cert. denied,* 471 U.S. 1020, 105 S.Ct. 2048, 85 L.Ed.2d 310 (1985); *Richardson v. Lucas,* 741 F.2d 753, 755 (5th Cir.1984). *See also Carroll v. Hoke,* 721 F.Supp. 446, 450–51 (E.D.N.Y.1989). The Indiana Supreme Court has also held that a state trial court judge's violation of the federal Constitution in failing to provide a "no adverse inference" instruction may be ignored when the error is harmless beyond a reasonable doubt. *See Parker v. State,* 425 N.E.2d 628, 630 (Ind.1981). *See also Brown v. State,* 446 N.E.2d 354, 357 (Ind. App.1983). We agree with the federal and Indiana courts' resolution of this issue and conclude that failure to provide a "no adverse inference" instruction may appropriately be disregarded when the error is harmless.

■ The harmless error rule "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence." *Rose v. Clark,* 478 U.S. 570, 577, 106 S.Ct.

---

5. Dissent at 310.

6. The dissent notes that the trial judge's decision may have resulted because the "court apparently misconstrued the guidance provided by the Supreme Court," concerning a defendant's right

to receive a "no adverse inference" instruction in the face of a co-defendant's request that the instruction not be given. Dissent at 311. However, the state trial court's subjective understanding of the involved constitutional rights is irrelevant.

3101, 3105, 92 L.Ed.2d 460 (1986). For a constitutional error to be harmless, "the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). In addressing the question of harmless error we often focus upon whether the evidence supporting a conviction is "overwhelming." *See, e.g., United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1020 (7th Cir.1987) ("Typically, we require other evidence of guilt to be 'overwhelming' before concluding a constitutional error is harmless."). However, we have also held constitutional errors harmless even in the absence of "overwhelming" evidence, focusing instead on the "impact of the objectionable material on the jury's verdict" as a means to determine whether "the jury would have convicted [the defendant] absent [the constitutional error]." *Fencl v. Abrahamson,* 841 F.2d 760, 769 (7th Cir. 1988). Under either approach our purpose is to determine whether the error was harmless beyond a reasonable doubt.

■ The facts of this case clearly establish Hunter's guilt. Hunter was identified by a bank teller as one of the robbers and observed wielding a silver handgun that was used not only during the robbery but also at the time a car was stolen during the attempt to flee from the robbery. Police confiscated a silver handgun and other items from Howard Smith's apartment where the robbers met to count their loot. Howard Smith was later arrested in the possession of dye-stained money; an old bar of soap also stained with red dye was found in Smith's apartment. The money appeared to be stained from the red dye packet planted in the money. In addition, Smith testified about statements Hunter made, recounting with specificity many of the facts and circumstances surrounding the events during and immediately after the robbery. Another accomplice (Anthony Thompson) testified as to Hunter's solicitation of his participation in a possible scheme to "make some money" on the day

of the robbery.[7] These facts, the physical evidence, the eyewitness testimony, and the accomplice's testimony clearly establish a case of Hunter's guilt beyond a reasonable doubt. We specifically disagree with Judge Sharp's reasoning that the combination of accomplice testimony, physical evidence and eyewitness identification offered in evidence failed to constitute "overwhelming" evidence of Hunter's guilt. " '[T]he view that the prosecution's case must answer *all* questions and remove *all* doubts ... of course, is not the law because that would be impossible; the proof need only satisfy reasonable doubt.' " *United States v. Nesbitt,* 852 F.2d 1502, 1511 (7th Cir.1988) (quoting *Borum v. United States,* 380 F.2d 595, 599 (D.C.Cir. 1967) (former Chief Justice Burger dissenting) (emphasis in *Borum* )).

Even if we were to focus upon the question of the effect on the jury of the failure to provide the "no adverse inference" instruction, as in *Fencl,* we would also hold that any alleged error was harmless. The district court believed that, in the absence of a "no adverse inference" instruction, there was " 'a reasonable possibility' that the jury may have considered the petitioner's failure to testify as a tacit admission to the truthfulness of the inculpatory statements that [Hunter] made to Smith and Thompson." *Hunter,* at 1344. The combined eyewitness, direct and physical evidence recounted in this opinion clearly and independently corroborate Thompson and Smith's accounts of Hunter's hearsay statements. We are convinced that because of the overwhelming evidence of guilt, Hunter's failure to testify and the lack of the no-inference instruction had no impact on the jury verdict. It is our belief that "the jury would have convicted [the defendant] absent [the alleged constitutional error]." *Fencl,* 841 F.2d at 769. Furthermore, if there were a constitutional error in the state court's failure to provide a no adverse inference instruction, it would have been harmless beyond a reasonable doubt.

7. Although Thompson declined the invitation to take part in the robbery, Thompson assisted

Smith in attempts to remove the red dye from the money.

In contrast to its voluminous attempt to refute our conclusion that the trial court committed no constitutional error, the dissent relegates its disagreement with our disposition of the harmless error issue to a footnote stating:

"As the majority correctly notes, the Supreme Court has yet to decide whether the failure to give a no adverse inference instruction can be harmless error. *See Carter*, 450 U.S. at 304, [101 S.Ct. at 1121]; *James v. Kentucky*, 466 U.S. 341 [104 S.Ct. 1830, 80 L.Ed.2d 346] (1984). While a serious question remains as to whether such error can ever [be] considered harmless, I need not reach the issue since I accept the district court's finding that it was clearly not harmless in this case."

Dissent at 312, n. 3. As previously discussed, the federal precedent uniformly supports a conclusion that a failure to provide a "no adverse inference instruction" can constitute harmless error. As also was discussed above, it is quite clear that the involved error was harmless beyond a reasonable doubt as the evidence of Hunter's guilt was overwhelming, and we are of the opinion that the jury would have convicted Hunter absent any alleged constitutional error. In light of our extensive delineation of the reasons why the error was harmless and the failure of the dissent to specifically isolate bases for harmlessness other than those set forth in the district court's opinion, we see no reason to alter our conclusion that any alleged constitutional errors were indeed harmless beyond a reasonable doubt.

Because we hold that the district court did not commit error in failing to provide a "no adverse inference" instruction, and that any such error under the facts of this case would have been harmless beyond a reasonable doubt, the judgment of the district court granting Hunter's petition for habeas corpus is

REVERSED.

FLAUM, Circuit Judge, dissenting.

During trial, Steven Hunter exercised his federal constitutional right to receive a "no adverse inference" jury instruction. *See*

*Carter v. Kentucky*, 450 U.S. 288, 300, 101 S.Ct. 1112, 1119, 67 L.Ed.2d 241 (1981). When his co-defendant objected to the giving of the instruction and exercised his *state* constitutional right not to have the instruction read to the jury, *see Parker v. State*, 425 N.E.2d 628, 630 (Ind.1981), the trial court believed that it was placed on the horns of a dilemma. The co-defendant, however, should not have been able to maintain a successful objection, the Supreme Court having previously determined that "the giving of [a no-adverse inference] instruction over the defendant's objection does *not* violate the privilege against compulsory self-incrimination guaranteed by the Fifth and Fourteenth Amendments." *Lakeside v. Oregon*, 435 U.S. 333, 340–41, 98 S.Ct. 1091, 1095–96, 55 L.Ed.2d 319 (1978) (footnote omitted) (emphasis added). Applying established principles of constitutional law, as the Indiana Supreme Court subsequently noted in a case posing the precise issue presented here, the proper route should have been apparent: the supremacy clause mandates that the "Fifth Amendment right to an instruction warning the jury not to draw adverse inferences from his silence must prevail over the right that this Court has granted under the Indiana Constitution to decide whether it suits [a defendant] to have such an instruction given or not." *Lucas v. State*, 499 N.E.2d 1090, 1093 (Ind.1986). Rather than reaching this result, the trial court chose to offer Hunter the option of severance, and when he declined, refused to read the instruction to the jury, instead honoring the objection of the co-defendant. The majority holds that Hunter effectively waived this fundamental constitutional right when, after affirmatively exercising it, he declined the trial court's proffered procedural remedy. Because in my view this holding contravenes clearly established Supreme Court precedent and the supremacy clause as well as recognized principles of waiver, I must respectfully dissent.

In *Carter v. Kentucky*, 450 U.S. 288, 300, 101 S.Ct. 1112, 1119, 67 L.Ed.2d 241 (1981), the Supreme Court reversed a defendant's conviction because his fifth and fourteenth amendment rights were violated

when the trial court refused to give a no adverse inference instruction to the jury. Speaking in unqualified terms, the Court recognized that as part of the criminal defendant's *"absolute* constitutional guarantee against self-incrimination," a trial judge *"must* give a single 'no adverse inference' jury instruction when requested by defendant to do so." *Id.* at 300, 101 S.Ct. at 1119 (emphasis added). "The Constitution obliges the trial judge to tell the jury, in an effective manner, not to draw the inference if the defendant so requests...." *James v. Kentucky,* 466 U.S. 341, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984). The right to a no adverse inference instruction, as identified by the Court, is absolute and unconditional; to receive the instruction the defendant who does not testify on his own behalf need only properly request that the instruction be given. Faced with the competing demands of the two defendants in this case, the trial court's remedy of severance was reasonable since it would have accorded each of the defendants what they sought. Defendant Hunter, however, was not bound to accept the offer and his decision must be viewed as equally appropriate, given the resources already devoted to the trial, the state of the law mandating that he receive the instruction over his co-defendant's objection, and the fact that he had already been placed in jeopardy. Once Hunter refused the offer, the trial judge was bound by the dictates of the Supreme Court to give the requested instruction. In acceding to co-defendant Hatcher's objection to the instruction, I am constrained to conclude that the trial judge deviated from established Supreme Court precedent and in doing so violated Hunter's constitutional right to receive the "no adverse inference" instruction.

It remains unexplained why the trial court denied co-defendant *Hatcher's* earlier repeated demands for severance. What is clear is that once Hunter turned down the trial court's eventual offer of severance, the court was bound to read the instruction over any objection by Hatcher. The court did not do so, and an examination of the record appears to reveal why—the trial court apparently misconstrued the guidance provided by the Supreme Court. Rather than reading *Carter, James,* and *Lakeside* to mandate that the instruction be given on demand despite the objection of a co-defendant, the trial judge found that in these cases "the Supreme Court says it [the no adverse inference instruction] doesn't have to be given. [The co-defendant] doesn't want it to be [given], so it will not." R. 164–65. I find erroneous such an interpretation of this line of precedent.

The majority apparently distinguishes the binding Supreme Court precedent *sub silentio,* instead relying on the position that Hunter was to blame for the conflict which he caused by demanding the instruction. This "responsibility-shifting," however, belies a fundamental fact—the government was the party that moved for a joint trial and the trial court granted the motion. In my view, any conflict between co-defendants cannot appropriately be attributed to either of them but instead must be traced to the actions and decisions of the prosecutor and the trial court.[1]

The majority exonerates the trial court's ruling by finding waiver on the part of the defendant. I must admit to some puzzlement as to how defendant Hunter can be deemed to have waived a fundamental right in the face of his express assertion of that very right. It is undisputed that Hunter was under no duty or obligation to accept the trial court's eventual offer of a new trial, just as he would have had no

---

1. The majority opinion relies on *United States v. Splain,* 545 F.2d 1131, 1133 (8th Cir.1976) and *United States v. Feroni,* 655 F.2d 707, 712 (6th Cir.1981) for the proposition that a "trial judge can not be faulted for any trial mishaps that he offers to and could correct." At 307. These cases involved straightforward evidentiary situations in which a defendant rejected an offer by the trial court to give a curative instruction to the jury in the face of prejudicial remarks made by government witnesses. In my view, these decisions of non-constitutional proportions cannot be supportive of the position forwarded by the majority that a defendant waives his constitutional right to a no adverse inference instruction when he refuses a trial court's offer of severance.

right to demand such action initially.[2] The majority is correct in suggesting that the "court devised and offered a logical and legally acceptable solution (severance) that would have protected both Hunter's federal constitutional right to receive a no adverse inference instruction and his co-defendant's [state] right not to receive an instruction." In my opinion, however, waiver cannot be woven from the defendant's declination of a trial court's solution to the perceived dilemma. Rather, the defendant must be deemed to have knowingly and intelligently waived a known constitutional right, *see Zerbst v. Johnson*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and here, to the contrary, Hunter knowingly and intelligently *exercised* the right. The majority does not speak of a "knowing and intelligent waiver" but rather only of how the defendant failed to deliver the trial court from the conflicting requests. Furthermore, the majority opinion does not refer to any persuasive authority to support its waiver analysis. Therefore, I respectfully decline to join in such an innovative interpretation of the defendant's actions.

The fifth and fourteenth amendment of the Constitution guarantee a criminal defendant the right that the jury be instructed that it is to draw no adverse inference from his decision not to testify. I do not believe that this absolute right, emphatically sanctioned by the Supreme Court, can be made conditional upon the defendant's acceptance of a procedural remedy fashioned by a trial court to meet the competing demands of jointly-tried co-defendants. In my judgment, this dilution of a fundamental constitutional protection cannot be supported in light of Supreme Court directives. I am in agreement with the district court that the writ should be granted since the trial court committed error of constitution-

al dimension when it refused to read the requested instruction to the jury. Therefore, I respectfully dissent.[3]

### ORDER

Sept. 17, 1990.

A majority of judges in active service have voted to rehear this case *en banc*. Accordingly,

IT IS ORDERED that rehearing *en banc* be, and the same is hereby, GRANTED.

IT IS FURTHER ORDERED that the judgment and opinion entered in this case on July 3, 1990 be, and are hereby, VACATED. This case will be reheard *en banc* at the convenience of the court.

---

**2.** At the time of trial, Hunter was entitled to severance only if a co-defendant's statement implicating the defendant was to be admitted or if "the court determine[d] that a separate trial is necessary to protect a defendant's right to a speedy trial or is appropriate to promote a fair determination of the guilt or innocence of a defendant." I.C. 35–34–1–11(b).

**3.** As the majority correctly notes, the Supreme Court has yet to decide whether the failure to

give a no adverse inference instruction can be harmless error. *See Carter*, 450 U.S. at 304, 101 S.Ct. at 1121; *James v. Kentucky*, 466 U.S. 341, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984). While a serious question remains as to whether such error can ever considered harmless, I need not reach the issue since I accept the district court's finding that it was clearly not harmless in this case.