Steve L. HUNTER, Petitioner–Appellee,

v.

Richard CLARK and Indiana Attorney General, Respondents–Appellants.

No. 89–2594.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 9, 1990.

Reargued Nov. 27, 1990.

Decided June 6, 1991.

Monica Foster, Robert W. Hammerle, Allen, Baratz, Conway & Hammerle, Indianapolis, Ind., for petitioner-appellee.

Kirk A. Knoll, Deputy Atty. Gen., Ronald J. Semler, Asst. Atty. Gen., Federal Litigation, Indianapolis, Ind., for respondents-appellants.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Richard Clark, Superintendent of the Indiana State Prison, and the Indiana Attorney General appeal the district court's granting of Steve Hunter's habeas corpus petition on the ground that the state trial judge's refusal to give the requested "no adverse inference" instruction violated Hunter's Fifth Amendment privilege against self-incrimination. Because we hold that the overwhelming evidence of Hunter's guilt makes the state court's refusal to give the instruction harmless beyond a reasonable doubt, we reverse.

## I. PROCEDURAL STATUS OF THE CASE

The facts leading to Hunter's conviction are set out in full in the opinion of the panel that initially heard this case, *Hunter v. Clark*, 906 F.2d 302 (7th Cir.1990), *reh'g*

*granted, en banc, vacated, Hunter v. Clark,* No. 89–2594 (7th Cir. Sept. 17, 1990). In brief, Hunter and two accomplices, Charles Hatcher and Lynell Beard, robbed a branch of Indiana National Bank in Indianapolis, Indiana, on January 24, 1984. During the course of the robbery, which was conducted at gunpoint, the bank robbers took the assistant manager hostage and stole at least two vehicles in their getaway. The State of Indiana charged Hunter with five counts of robbery and one count of confinement, and the state prosecutor chose to try Hunter jointly with codefendant Hatcher. Hatcher repeatedly objected to the joint trial, but the state judge refused to grant his requests for severance.

During the trial court's preliminary discussion of jury instructions with counsel, prior to the taking of evidence, Hunter requested that a "no adverse inference" instruction be given, while Hatcher requested that the instruction not be given. The trial judge stated that he would not give the instruction, for "the [Indiana] Supreme Court says it doesn't have to be given," State Rec. at 165, whereupon the following colloquy occurred:

Defense Counsel: "It is [Hunter's] desire that the instruction be given.

Court: "So you want severance of the jury trial then to be able to do that?

Defense Counsel: "Judge, we're just requesting that instruction to be given. And, we would like our objection noted as not being given at this point.

Court: "I'll show your request to be given noted for the record. And, possibly, by the time we get around to final instructions, maybe I will give it."

*Id.* at 165–66. The state judge eventually determined that he would not give the requested "no adverse inference" instruction. *See id.* at 1180–81. The jury found Hunter guilty of all six charges, and the court sentenced Hunter to six consecutive twenty-year terms of confinement for each count (120 years).

Hunter appealed his conviction and sentence to the Indiana Supreme Court on the same ground he alleges here, that his Fifth Amendment right against self-incrimination was violated when the trial judge refused to give the "no adverse inference" instruction. After reciting the facts regarding the co-defendants' opposing requests about the "no adverse inference" instruction, the Indiana Supreme Court held:

"By his actions here, Hunter placed the trial court on the horns of a dilemma which made it impossible for it to refrain from committing error. The trial court gave Hunter the opportunity to resolve this dilemma by offering to sever the trials as Hatcher had, in fact, requested, but Hunter declined to accept that alternative. He therefore has waived any error the court might have committed in resolving the matter as he did."

*Hunter v. State,* 492 N.E.2d 1067, 1069 (Ind.1986).

Having exhausted his state court remedies, Hunter filed his federal habeas corpus petition on October 26, 1988, pursuant to 28 U.S.C. § 2254. The district court granted Hunter's petition on the grounds that there was no waiver of the "no adverse inference" instruction, Hunter's Fifth Amendment right against self-incrimination was violated by the failure to give the instruction, and the error was not harmless beyond a reasonable doubt because "the evidence supporting the petitioner's convictions is not 'overwhelming.'" *Hunter v. Duckworth,* 741 F.Supp. 1338, 1343 (N.D. Ind.1989). On appeal, a panel of this Court reversed the grant of habeas in a split opinion, holding, as did the Indiana Supreme Court, that Hunter received an offer of severance, in rejecting the offer he waived his right to a "no adverse inference" instruction and that an offer of severance is a constitutionally acceptable alternative to giving the "no adverse inference" instruction. The panel further held that even if the failure to give a "no adverse inference" instruction was an error of constitutional magnitude, it was harmless error, as the evidence of Hunter's guilt was overwhelming. *See Hunter v. Clark,* 906 F.2d 302 (7th Cir.1990). We vacated the panel opinion and granted rehearing *en banc* on September 17, 1990.

On appeal to the *en banc* Court, Hunter argues that a severance offer is an unac-

ceptable alternative to giving the "no adverse inference" instruction, that he did not waive his right to a "no adverse inference" instruction, the failure to give a "no adverse inference" instruction is not subject to harmless error analysis and even if it were, that the error was not harmless beyond a reasonable doubt. Since we base our reversal of the district court's grant of Hunter's habeas petition on the ground of harmless error, we need not deal with Hunter's waiver arguments.

## II. DISCUSSION

■■■ Hunter no doubt has a right, upon request, to receive a "no adverse inference" instruction under *Carter v. Kentucky,* 450 U.S. 288, 300, 101 S.Ct. 1112, 1119, 67 L.Ed.2d 241 (1981) ("the Fifth Amendment requires that a criminal trial judge must give a single 'no adverse inference' jury instruction when requested by defendant to do so."). It is also clear that if the state judge had given a "no adverse inference" instruction over Hatcher's objection, that would not have violated Hatcher's rights under the federal Constitution. *Lakeside v. Oregon,* 435 U.S. 333, 340–41, 98 S.Ct. 1091, 1095, 55 L.Ed.2d 319 (1978) ("the giving of [a 'no adverse inference'] instruction over the defendant's objection does not violate the privilege against compulsory self-incrimination guaranteed by the Fifth and Fourteenth Amendments."). But under the Indiana Supreme Court's interpretation of the Indiana Constitution at the time of Hunter's trial, Hatcher possessed a right to refuse a "no adverse inference" jury instruction: The opportunity "for the accused to choose whether to have the jury given an instruction regarding his failure to testify is a requisite for full realization of the right of each citizen granted by Article I, Section XIV [of the Indiana Constitution] that 'no person, in any criminal prosecution, shall be compelled to testify against himself.'" *Priest*

*v. State,* 270 Ind. 449, 386 N.E.2d 686, 689 (1979). This conflict between the United States Supreme Court's interpretation of the federal Constitution and the Indiana Supreme Court's interpretation of the state Constitution is the basis for what the Indiana Supreme Court described as the trial court's "dilemma" in the face of Hunter's and Hatcher's divergent requests. *Hunter v. State,* 492 N.E.2d at 1069. The Indiana Supreme Court has since eliminated the possibility of such a dilemma again occurring in a joint trial by recognizing that the "Fifth Amendment right to an instruction warning the jury not to draw any adverse inferences from [the defendant's] silence must prevail over the right that this Court has granted under the Indiana Constitution to decide whether it suits [the defendant] to have such an instruction given or not." *Lucas v. State,* 499 N.E.2d 1090, 1093 (Ind.1986).

■■■ Assuming *arguendo* that Hunter did not waive the right to the requested instruction and thus the state judge's refusal to give Hunter's requested "no adverse inference" jury instruction violated Hunter's Fifth Amendment right against self-incrimination, the error was harmless "if the prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict," *Satterwhite v. Texas,* 486 U.S. 249, 256, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988), or perhaps even if the state can demonstrate that the error did not have "substantial and injurious effect or influence in determining the jury's verdict." *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).[1] While the Supreme Court has not specifically held that the failure to give a "no adverse inference" instruction when requested could be subject to harmless error analysis, in *Chapman v. California,* 386 U.S. 18, 23,

---

1. In his concurrence, Judge Easterbrook makes a persuasive attack against requiring the state to prove that a constitutional violation of a prophylactic rule was harmless "beyond a reasonable doubt" when defending a habeas motion. He may well be correct, but in this case the

State has met even the stringent "beyond a reasonable doubt" standard that is applicable on direct appeal. *See Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 1261, 113 L.Ed.2d 302 (1991).

87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967), the Court held that harmless error analysis was applicable to a prosecutorial comment about the defendant's failure to testify. We agree with the Fifth Circuit that prosecutorial comment on the defendant's failure to testify is a greater violation of a defendant's Fifth Amendment right against self-incrimination than is a trial judge's failure to give a requested "no adverse inference" instruction:

"The two types of error both implicate the fifth amendment's privilege against self-incrimination. Furthermore, the *Chapman* error is the more egregious. There, the prosecution openly informs the jury of the defendant's failure to testify and of the inferences of guilt which can be drawn therefrom. After reading *Chapman* and considering the two types of error involved, we can perceive no reason for distinguishing the two types insofar as the application of the harmless error doctrine is concerned."

*Richardson v. Lucas,* 741 F.2d 753, 755 (5th Cir.1984). The Fifth Circuit reaffirmed its belief that harmless error analysis is applicable to the failure to give a "no adverse inference" instruction when requested in *United States v. Ramirez,* 810 F.2d 1338, 1344 (5th Cir.1987), and the Sixth Circuit has likewise employed harmless error analysis in reviewing a failure to give a "no adverse inference instruction." *See Finney v. Rothgerber,* 751 F.2d 858, 864 (6th Cir.1985), *cert. denied,* 471 U.S. 1020, 105 S.Ct. 2048, 85 L.Ed.2d 310 (1985). In view of the Supreme Court's recent extension of the harmless error doctrine to the erroneous admission of a coerced confession in *Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), we are convinced that we should utilize it here.

"Since this Court's landmark decision in *Chapman v. California,* 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] (1967), in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless error analysis to a wide range of errors and has recognized that *most constitutional errors can be harmless.* . . . In applying harmless-error analysis ... the Court has been faithful to the belief that the harmless-error doctrine is essential to preserve the 'principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focussing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.'"

*Id.* 111 S.Ct. at 1263–64 (citations omitted) (emphasis added). We recognize that "there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial. . . . Since *Chapman,* the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, *including most constitutional violations.*" *United States v. Hasting,* 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983) (emphasis added) (citations omitted). While Hunter's trial was not perfect, and we might add, very few are, any error was harmless in view of the overpowering evidence of his guilt. In applying harmless error analysis to the state judge's failure to give Hunter's requested "no adverse inference" instruction, we must decide whether the evidence presented against Hunter at trial was "overwhelming." *See United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1020 (7th Cir.1987) ("Typically we require other evidence of guilt to be 'overwhelming' before concluding a constitutional error is harmless.").

It is clear that the evidence in this case was so convincing that even if the trial judge had given the requested "no adverse inference" instruction, it would not have affected the jury's verdict. The evidence against Hunter consisted of testimony from the following five individuals: Phyllis Jones, a bank teller who made positive eyewitness identification of Hunter; two accessories-after-the-fact, Howard Smith and Anthony Thompson; Tracy Williams, Howard Smith's cousin; and Leesa Cosby,

a friend of Lynell Beard, one of the robbers. Ms. Cosby's testimony placed Hunter with Beard shortly before and four or five hours after the robbery. At 9:18 a.m. Ms. Cosby called Beard, and Hunter answered the phone; at 5:30 p.m. that evening, Ms. Cosby called Hunter's number, and Beard answered the phone. About 9:30 a.m., Ms. Williams saw Hunter enter Charles Hatcher's apartment and then observed Hunter leaving with Hatcher about ten minutes later. About 10:00 a.m. Smith encountered Hunter on a street with the other two bank robbers, Lynell Beard and Charles Hatcher. The three men accompanied Smith to Smith's apartment and he (Smith) gave them the shotgun they used in the robbery. The bank robbery occurred about 11:00 a.m., and Ms. Williams testified that between 11:00 a.m. and 11:30 a.m. (after the robbery) Beard, Hatcher and Hunter arrived at her apartment where she lived with Smith and his girlfriend. Hunter was present when the money was taken out of a pillow case, and Williams testified that Hunter was the person who divided the money among the three bank robbers. Williams and Smith were both present while the money was being divided, and both testified that they heard Hunter describe his part in the robbery. Smith testified that Hunter directed that each of the other two robbers give Smith $100. Thompson, Hunter's first cousin, testified that he saw Hunter, Beard and Hatcher arrive at Hunter's apartment shortly after noon. Hunter bragged that they had just committed a robbery and invited Thompson to his apartment. After arriving at the apartment, they began partying, and Hunter once again bragged about the robbery and showed Thompson the money. Thompson asked Hunter to give him some of the money, but instead, Hunter called Smith and suggested to Smith that he share some of the money that Hunter had left with him. Thereafter, Thompson went to Smith's apartment and helped Smith wash some of the red dye off the bank's money. Given the weight of this testimony that places Hunter in the presence of Beard and Hatcher throughout the day of the robbery, when combined with the eyewitness

testimony, it is stretching credulity to ask one to believe that an instruction to the jury that they should draw "no adverse inference" from Hunter's failure to testify would have changed their verdict. This conclusion is further bolstered by the fact that Smith was able to place Hunter at the scene of the robbery through identification of him from a photo taken by a bank camera during the robbery. This evidence is more than sufficient to support the jury's verdict regardless of whether a "no adverse inference" instruction was given, for " 'the view that the prosecution's case must answer *all* questions and remove *all* doubts ... of course, is not the law because that would be impossible; the proof need only satisfy reasonable doubt.' " *United States v. Nesbitt*, 852 F.2d 1502, 1511 (7th Cir.1988) (quoting *Borum v. United States*, 380 F.2d 595, 599 (D.C.Cir. 1967) (former Chief Justice Burger, dissenting)) (emphasis original).

The evidence against Hunter becomes even more overwhelming when considered along with the eyewitness testimony, to which the district court failed to give the weight it is entitled to receive. The totality of the district judge's acknowledgment of the eyewitness testimony in his Memorandum and Order reads as follows:

"Phyllis Jones, a bank employee, positively identified the petitioner at trial as one of the three robbers in the bank. Her testimony, however, is not corroborated by any other witnesses. In fact, none of the victims of the crimes (five in all) could positively identify the petitioner at trial. Moreover, there is no hard physical evidence which supports the charges."

*Hunter v. Duckworth*, 741 F.Supp. at 1343. This cavalier treatment of a positive identification of an eyewitness fails to give adequate consideration to the credibility of the eyewitness. Ms. Jones was the only bank employee to get a good look at Hunter's face. When she first noticed him, he was standing behind her, and when she turned around she was looking directly into his face about one foot away. Ms. Jones testified as follows:

Q. "Would you estimate for the Jury the approximate distance between yourself and that man at that time?

A. "About a foot.

\* \* \*

Q. "As you turned to face that man what occurred then?

A. "I asked him 'could I help you' he said 'I want to open an account'. And, I said 'savings or checking' he said 'savings'.

Q. "At that time in the conversation was there any type of covering over the man's face?

A. "No, there was not.

Q. "Was the face totally there, that is open to observation?

A. "Yes.

Q. "Was there anything during the conversation that particularly attracted your attention to that person?

A. "Yes, when he asked me he wanted to open an account he said it in such a way it was very bold uh, little more loud than just normal conversation. And, it sort of caught me off guard. Like really?

Q. "Were you scared at that point?

A. "No.

Q. "What was your reaction then?

A. "I really didn't want to open an account for him.

Q. "Where were you looking during the course of this conversation?

A. "Right at his face."

Ms. Jones testified that she told a Sheriff Deputy on the day of the robbery that she could identify one of the robbers, and described the robber's sex, race, height, weight and clothing. She stated that she requested to be interviewed by the FBI, but the FBI failed to interview her. Five months later, when the Sheriff's Department first showed photographs to her, Ms. Jones was able to positively identify Hunter in one of the photos. In describing her reaction to the pictures, Ms. Jones stated "I just looked at them. Uh, *I could never forget his face, I just knew what it was.*" Ms. Jones had a strong negative reaction to

Hunter when she first saw him, and she has never doubted her ability to identify him. Such positive eyewitness testimony is entitled to great weight in the trial court as well as this Court on review. Yet the district court dismissed this testimony because it was "not corroborated by any other witnesses[, and] none of the other victims of the crimes ... could positively identify the petitioner at trial." The fact that the other victims of the robbery were unable to make a positive I.D. certainly is of no concern and is insufficient to invalidate Ms. Jones' I.D., since none of them had a good view of Hunter's face. Believable evidence from one eyewitness is adequate to establish the identity of a criminal defendant, and when there is overwhelming corroborating evidence in addition to the eyewitness testimony, as recited above, there is even more reason to find it convincing. *See United States v. Smith,* 563 F.2d 1361, 1363 (9th Cir.1977). Here, Ms. Jones was confident that she could identify the robber from the very moment of the robbery on, and she did in fact identify him both from photographs and in person at trial. At trial she testified specifically about what impressed her as Hunter's singular identifying features of a round face, oily complexion and gaps between his teeth as well as to details of his clothing, the black mask that she saw him put on as he announced the robbery, and his silver handgun. She recounted in detail the defendant Hunter's actions, oral threats and other statements he made to her and others while she could see and hear him. Ms. Jones also authenticated State's Exhibits 61–170, surveillance photographs of the robbery, in which she further identified Hunter and described his actions. This is far from the fleeting 2–4 second eyewitness exposure to a defendant that is frequently discredited at trial through proper cross-examination. What more can a court ask from a witness than the detailed account Ms. Jones gave—she did all but describe which finger was on the trigger. Furthermore, the district judge was incorrect in stating that Ms. Jones' testimony "is not corroborated by any other witnesses." Howard Smith identified Hunter in one of the bank photographs

taken during the robbery. Even though Hunter was wearing a mask at the time, Smith's identification is quite probative, since Smith was well-acquainted with Hunter for some eight or nine years. There is nothing unusual about being capable of identifying a friend of 8 or 9 years in a picture through stature (Hunter is short and stocky) and clothing when Smith observed Hunter immediately prior to and immediately after the robbery, especially if Hunter was wearing the same clothing. When combined with the evidence that places Hunter in the company of the other bank robbers throughout the day of the robbery and with Hunter's incriminating statements to other witnesses, the eyewitness testimony of Smith and Ms. Jones is more than persuasive that any error was harmless beyond a reasonable doubt.

The district court's, and the dissent's, main concern with the eyewitness testimony was that Ms. Jones was the only witness who positively identified Hunter as the man who entered the bank to open an account and drew a gun. (The district judge seems to have overlooked the fact that Howard Smith—a friend of 8 or 9 years—identified Hunter as one of the men displayed in the pictures taken by bank cameras during the robbery.) It certainly should not be surprising that Ms. Jones is the only eyewitness from the bank to positively identify Hunter, since she was the only bank employee to personally speak with Hunter and closely observe his face and features (within 1 foot) before he donned his ski mask in a futile attempt to disguise himself. Lori Meyers testified that she did not get a good look at the robber; the bank manager testified that as he looked up, he observed the robber pulling a ski mask down over his face; the assistant bank manager testified that while he glanced at the robber's face, he did not get a good look at him; and other witnesses who were present at the robbery testified that they deliberately looked away from the robbers because of fear. Thus, the other bank employees were honest and truthful in explaining why they were unable to identify Hunter. Moreover, Ms. Jones' eyewitness identification of Hunter is especially credible in view of her unrelenting positive identification of him: She picked his picture out of a group of photos; she identified Hunter in a bank photograph; she identified Hunter in court, and emphasized her identification stating, *"I could never forget his face."*

The district court found (in nothing short of an incredulous conclusion) "that there does not exist 'substantial direct evidence' against [Hunter]" sufficient to make a constitutional error harmless, since there was only one eyewitness, and much of the testimony from Hunter's accomplices was hearsay based upon statements made by Hunter and the other participants in the bank robbery. *Hunter v. Duckworth,* 741 F.Supp. at 1344. Thus, the district judge somehow concluded that the failure of Hunter to take the stand to deny the statements attributed to him could well have contributed to his guilty verdict in the absence of the "no adverse inference" instruction. *Id.* We addressed the issue of what constitutes "substantial direct evidence" in *Dortch v. O'Leary,* 863 F.2d 1337 (7th Cir.1988), where the prosecutor made inappropriate statements in closing argument about the defendant's failure to testify. On appeal, "the petitioner argue[d] that the testimony of [the witness] regarding his inculpatory statement to her was not substantial because the petitioner was the best person to rebut such testimony." *Id.* at 1344. We held that while the single confession in itself was not substantial direct evidence, when bolstered by the eyewitness testimony of a second witness,

> "[t]he record reflects that substantial direct evidence exists to support a holding that the allegedly constitutional error committed by the prosecutor was indeed harmless. Specifically, [the witness'] lineup and incourt identification of the petitioner constitute proof beyond a reasonable doubt that despite the prosecutor's remarks, the jury would have returned a verdict of guilty."

*Id.* at 1345. The overwhelming quantity of evidence of Hunter's guilt recited above certainly constitutes far more "substantial direct evidence" than the facts in *Dortch.*

Initially, we note that in this case three witnesses, Tracy Williams, Anthony Thompson and Howard Smith testified regarding Hunter's inculpatory statements. Secondly, in view of the overwhelming weight of the evidence against Hunter, the jury could well have found him guilty even without the testimony concerning Hunter's description of the bank robbery. Third, in view of the unrelenting positive identification of Hunter from Ms. Jones as well as Smith's identification of Hunter in the photograph from the bank's camera, the "no adverse inference" instruction would have had little or no impact on the jury. Eyewitness testimony obviously is more convincing and carries more weight with the average juror than an instruction to draw no adverse inference from the defendant's failure to testify. Fourth, there was a substantial amount of testimony from the accomplices and other witnesses dealing with their personal observations and contact with Hunter immediately prior to and immediately after the crime: a) There were three men involved in the robbery, and testimony from Leesa Cosby, Tracy Williams and Howard Smith placed Hunter in the company of the other two robbers both before and after the robbery; b) Tracy Williams and Howard Smith testified that they saw Hunter and his co-robbers counting the red-dyed money in Smith's apartment; c) Tracy Williams identified Hunter as the one who divided the money among the robbers; and d) Anthony Thompson observed Hunter attempting to wash the red dye off the money. We fail to understand how the district court can say that the quality and quantity of corroborating evidence of this impact combined with eyewitness testimony fails to reach the level of "substantial direct evidence." We note that in reciting the evidence against Hunter, the district judge neglected to refer to, much less discount, the testimony of Leesa Cosby or Tracy Williams. We find this omission surprising, especially in view of the incriminating nature of Tracy Williams' testimony set forth above.

A failure to give the "no adverse inference" instruction to protect the prophylactic rule that the prosecutor cannot ask a jury to draw an adverse inference from the defendant's failure to testify which in turn protects the defendant's actual constitutional right to refuse to testify,[2] was clearly harmless beyond a reasonable doubt, especially in light of the overwhelming nature of the testimony against Hunter and of equal importance is the fact that the petitioner fails to raise even a colorable claim of innocence. "[T]here is no doubt that respondent is guilty of the crime of which he was convicted and deserving of punishment; respondent had a full and fair opportunity to litigate his claim in state court," *Duckworth v. Eagan*, 492 U.S. 195, 109 S.Ct. 2875, 2882, 106 L.Ed.2d 166 (1989) (O'Connor, J., concurring), and ordering a new trial for an individual who is guilty of the crime of bank robbery beyond a reasonable doubt would be a waste of judicial time and resources. Because "a constitutional error does not automatically require reversal of a conviction," *Arizona v. Fulminante*, 111 S.Ct. at 1263, the granting of a habeas corpus petition for the harmless violation of a prophylactic rule of this nature (which should never again occur in the State of Indiana—state law changed) would be inappropriate.

> "[L]ower federal courts often sit in 'review' of the judgments of the highest courts of a state judicial system. This situation has always been a flashpoint of tension in the delicate relationship of the federal and state courts, and *this exercise of federal power should not be undertaken lightly where no significant federal values are at stake.*"

*Duckworth v. Eagan*, 109 S.Ct. at 2884 (O'Connor, J., concurring) (emphasis added). Given the overwhelming weight of the evidence against Hunter, the failure to give the requested "no adverse inference" instruction was harmless beyond a reasonable doubt, thus no significant federal val-

---

**2.** See Concurrence at 865: "We are dealing with a prophylactic rule *Carter* created to protect the prophylactic rule *Griffin* created, not with the constitutional right itself."

ue is at stake. The district court's grant of the petitioner's habeas corpus motion is

REVERSED.

EASTERBROOK, Circuit Judge, with whom POSNER, Circuit Judge, joins, concurring.

I agree with Judge Coffey that the writ of habeas corpus should not have issued. Although he makes a strong argument that any error is harmless beyond a reasonable doubt, I believe that the state need not surmount such a high hurdle.

Hunter contends that Indiana violated the self-incrimination clause of the fifth amendment, applied to the states by the due process clause of the fourteenth. But Hunter was not compelled to be a witness against himself, and no evidence was derived from a violation of the privilege. Hunter's claim depends not on the Constitution but on a series of cases establishing rules that make exercising the privilege more attractive to defendants. The difference between the Constitution and extra-constitutional rules should affect the state's burden.

Although the privilege against compulsory self-incrimination prevents the prosecution from calling the defendant as a witness, the accused may choose to speak. If he does, he waives the privilege with respect to all subjects covered on direct examination. Fear of cross-examination keeps many a defendant off the stand. Naturally the prosecutor wants to argue to the jury that an accused who elects not to testify must have something to hide. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), reasons that an inference of this kind is a "price" on the privilege to remain silent and holds that the prosecutor may not make the privilege costly. *Griffin* does not enforce the privilege so much as it creates a prophylactic rule that makes it easier for a suspect to remain silent. *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), in turn requires the judge on defendant's demand to inform the jury about *Griffin*'s rule. *Carter* is at least two steps removed from the constitutional privilege (three if we count the incorporation doctrine applying the fifth amendment to the states; and there are more steps that I omitted in summarizing *Griffin*). We are dealing with a prophylactic rule *Carter* created to protect the prophylactic rule *Griffin* created, not with the constitutional right itself. And we are dealing with a collateral attack under 28 U.S.C. § 2254, which extends federal judicial power well beyond the Great Writ established by the Constitution—the pretrial writ that prevents indefinite detention without trial.

Indiana violated the rule established in *Carter*. If, as the Supreme Court of Indiana believed, the trial judge offered Hunter a severance, that does not help the state. A judge may not compel the accused to choose between the right (established by the double jeopardy clause) to get things over with in a single trial and the right to the *Carter* instruction. Severance could have been granted before trial, or the court could have given Hatcher the mistrial he requested; either way both defendants could have received their due without sacrificing some other right. Yet we know from *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that express comment on a defendant's election not to testify may be harmless error. It follows that a violation of *Carter* also may be harmless. Cf. *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 1263–66, 113 L.Ed.2d 302 (1991).

"Harmless beyond a reasonable doubt", the standard of *Chapman*, is inappropriate here for three reasons. First, this is a collateral attack; *Chapman* was a direct appeal, as was *Fulminante* and all other cases in the Supreme Court using the "reasonable doubt" standard. Second, *Carter* is one step farther removed from the Constitution than is *Griffin*. Third, *Carter* is designed more to allow the defendant to choose which of two risks to take than it is to prevent the conviction of an innocent person. Informing the jurors about *Griffin* may remind them of an inference they otherwise would not have drawn, so a defendant might oppose the giving of such an instruction. At the same time, the instruc-

tion may arm conscientious jurors with information about their proper tasks. See *United States v. Myers*, 917 F.2d 1008 (7th Cir.1990). Neither giving nor withholding the instruction has a certain, powerful, effect on the jury's work, which implies that the state need not bear the heavy burden of showing that an error could not conceivably have affected the outcome.

Only an error that has substantial influence on the course of the trial and produces actual prejudice justifies collateral relief. Cf. *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986); *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). The omission of a *Carter* instruction is not that serious. I made a similar argument in *United States ex rel. Miller v. Greer*, 789 F.2d 438, 448–54 (7th Cir.1986) (in banc) (dissenting opinion), and will not repeat myself. The Supreme Court granted certiorari on this question but reversed us on other grounds. *Greer v. Miller*, 483 U.S. 756, 761 n. 3, 107 S.Ct. 3102, 3106 n. 31, 97 L.Ed.2d 618 (1987). Justice Stevens, who alone considered the question on which review had been granted, concluded that a distinct standard of harmlessness applies on collateral review. *Id.* at 767–69, 107 S.Ct. at 3109–11 (concurring opinion).

*Carter* establishes a prophylactic rule, and there is much less need to enforce such rules on collateral attack than there is to enforce the core constitutional rules. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), holds that the exclusionary rule is not enforced at all on collateral attack; two Justices argued in *Duckworth v. Eagan*, 492 U.S. 195, 207–13, 109 S.Ct. 2875, 2882–85, 106 L.Ed.2d 166 (1989) (O'Connor & Scalia, JJ., concurring), that *Miranda* should receive the same treatment. Cases such as *McCleskey v. Zant*, —— U.S. ——, 111 S.Ct. 1454, 1469–70, 113 L.Ed.2d 517 (1991); *Teague v. Lane*, 489 U.S. 288, 308–09, 109 S.Ct. 1060, 1073–74, 103 L.Ed.2d 334 (1989); *Kuhlmann v. Wilson*, 477 U.S. 436, 452–55, 106

S.Ct. 2616, 2626–28, 91 L.Ed.2d 364 (1986); and *United States v. Timmreck*, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979), reinforce the conclusion that it takes more to succeed on collateral attack than on direct appeal. See also Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142 (1970); Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv.L.Rev. 441 (1963).

If Justice O'Connor's view in *Eagan* prevails, then *Carter* may well not apply at all on collateral attack. It certainly ought not be enforced with the same rigor as it would be on direct appeal. *Eagan*, 492 U.S. at 212, 109 S.Ct. at 2884 (O'Connor, J., concurring). Once the criminal appeal has run its course, the judgment is entitled to great respect from a federal court. *McCleskey*, 111 S.Ct. at 1469. The "reasonable doubt" standard, compelling the state to justify the judgment with the same burden it bears before the jury in the first instance, is out of place in the collateral enforcement of prophylactic rules.

FLAUM, Circuit Judge, with whom BAUER, Chief Judge, WOOD, Jr., CUDAHY, and RIPPLE, Circuit Judges, join, dissenting.

Despite the majority's focus on the question of harmless error, there is an important question of law embedded in this appeal which has unfortunately been neglected. To identify and resolve this issue, we must retrace our steps. The original panel majority in this case found that the trial court had offered to sever the trials of Hunter and Hatcher when the no-inference instruction dilemma first presented itself, so that Hunter might receive the instruction and Hatcher would not. The panel majority noted that Hunter had refused the district court's severance offer, and concluded that this refusal constituted waiver of his fifth amendment right, see *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), to a no-inference instruction.[1] The necessary predicate to this

---

1. My review of the record indicates that, in fact, the trial court never offered Hunter severance

as an option. The Indiana court discussed the no-inference instruction at two points during

conclusion was the panel's belief that severance was an *acceptable* solution to the defendants' divergent instruction requests. I disagree with this proposition, and so, it appears, do my colleagues in concurrence. The original panel majority's position on the question of waiver clearly burdens a defendant's exercise of his right to a no-inference instruction, a right which in my view is absolute. As Judge Easterbrook succinctly puts it, "A judge may not compel the accused to choose between the right (established by the double jeopardy clause) to get things over with in a single trial and the right to the *Carter* instruction." *Ante* at 865. Indeed, to compel a defendant to submit to retrial rather than grant his constitutionally sanctioned instruction request places an unnecessary and unacceptable burden on his "valued [fifth amendment double jeopardy clause] right to have his trial completed before a particular tribunal." *Crist v. Bretz*, 437 U.S. 28, 36, 98 S.Ct. 2156, 2161, 57 L.Ed.2d 24 (1978); *see also Green v. United States*, 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957); *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). Given that the no-inference instruction could be issued without constitutional problem over the objections of Hunter's co-defendant, *see Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978), I believe the trial court erred in not simply granting Hunter's instruction request. I further believe that the original panel majority erred in holding that severance was a constitutionally acceptable alternative to granting the request. In short, the fifth amendment mandates that requests for no-inference instructions in all circumstances be honored. I regret that the majority declines to address this question of law, *ante* at 859, which, in my mind at least, motivated the court's decision to rehear this case *en banc*.

I further part company with the majority on the question of harmless error. The district court concluded that the state did not prove the trial court's failure to give the no-inference instruction to be harmless beyond a reasonable doubt, and I defer to that conclusion. The district court did not believe that the state presented "substantial direct evidence" against Hunter. It observed that the testimony of Smith and Thompson consisted primarily of hearsay

trial. The first occurred after the jury was sworn in, during the court's review of preliminary jury instructions with counsel. After being presented with the defendants' conflicting requests, the trial judge told counsel that he would not give the instruction because "the Supreme Court says it doesn't have to be given." *See* State R. 165. In response, the following colloquy ensued between Hunter's counsel, Mr. Fairman, and the court:

*Fairman:* It is [Hunter's] desire that the instruction be given.

*Court:* So you want severance of the Jury trial then to be able to do that?

*Fairman:* Judge, we're just requesting that instruction to be given. And, we would like our objection noted as not being given at this point.

*Court:* I'll show your request to be given noted for the record. And, possibly, by the time we get around to final instructions maybe I will give it.

*Id.* at 165–66. Later in the trial, during its review of final jury instructions with counsel, the court made its only other statement about and final resolution of the no-inference instruction issue:

*Court:* [T]hat brings us down to the final instruction tendered by Defendant Hunter. To the instruction that was tendered by Defendant, Hunter, that being one which is under advisement since it was originally offered in the Court's preliminary instructions. There was an objection at the time by Mr. Spencer [Hatcher's counsel], that objection has been renewed. There was no objection by the State. Since there is objection by one of the Defendants it will be the Court's determination that that instruction will not be given.

State R. 1180–81.

The record excerpts make abundantly clear that the court *never offered Hunter severance as an option*. The court merely asked, as a point of clarification before the presentation of evidence, whether severance was what Hunter sought, and in fact held out the possibility that it might issue the no-inference instruction at the close of trial. After the presentation of evidence, upon deciding not to issue the final no-inference instruction, the court never suggested that it was ruling against Hunter because he declined an earlier severance offer; it merely ruled that "[s]ince there is objection by one of the defendants ... [the] instruction will not be given." If the trial court had intended to respond to Hunter's instruction request by offering severance, one would expect to see at least some mention of severance in the court's final denial of that request.

868

accounts of the crime rather than more credible eyewitness accounts, and surmised that there was a "'reasonable possibility' that the jury may have considered the petitioner's failure to testify as a tacit admission to the truthfulness of [Hunter's] inculpatory statements ..." (quoting *Fahy v. State of Connecticut*, 375 U.S. 85, 86, 84 S.Ct. 229, 230, 11 L.Ed.2d 171). The court held that because the only powerful evidence against Hunter was Phyllis Jones' identification, the state had not met its burden of proving the trial court's error harmless beyond a reasonable doubt.

In my view, the evidence against Hunter, though clearly not insignificant, was not "overwhelming" either. I recognize that the state has presented and the majority has pointed to a good deal of circumstantial evidence linking Hunter to the robbery. In the end, however, this seems to me, at its core, a one-eyewitness case in which two of the other people testifying against Hunter did so, at least in part, in order to avoid prosecution.[2] A third witness, Tracy Williams, appears to have identified Hunter for the first time in court, five months after the robbery took place. While I do not question the admissibility of Williams' identification, I note the suggestive nature of first-time in-court identifications. *See Moore v. Illinois*, 434 U.S. 220, 229–230, 98 S.Ct. 458, 465–466, 54 L.Ed.2d 424 (1977).

Although I recognize that the failure to give the no-inference instruction may, in some cases, be harmless, I cannot lightly discount the possible prejudicial effects of such error. The right to receive a no-inference instruction was created in recognition of the fact that "many, even those who should be better advised, view [the fifth amendment] privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are ... guilty of crime...." *Carter*, 450 U.S. at 302, 101 S.Ct. at 1120 (quoting *Ullman v. United States*, 350 U.S. 422, 426, 76 S.Ct. 497, 500,

100 L.Ed. 511 (1956)). Viewing the evidence against Hunter with these cautions in mind, I am constrained to agree with the district court that the Indiana trial court's failure to give the no-inference instruction may have substantially affected the jury's evaluation of the credibility of Smith and Thompson. This is no doubt a close case on the question of harmless error; given the nature of the evidence against Hunter, I, like the experienced district court judge in this case, cannot conclude with confidence that the trial court's failure to honor Hunter's instruction request was harmless beyond a reasonable doubt.

---

**2.** The majority asserts that one of these witnesses, Howard Smith, identified Hunter as being present in bank photographs taken during the course of the robbery. The man who Smith identified as Hunter was wearing a ski mask that completely shrouded his face, as well as a dark jacket, dark pants, and dark shoes. *See* State R. 752. Smith testified that he was nevertheless capable of identifying the masked man. *Id.* at 728. Such testimony, of course, is of limited probative value and casts doubt on the credibility of Smith's other testimony.